**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1672
_____

KEVIN JOSEPH KELLY; KARRIEM BEY,
On behalf of themselves and all others similarly situated,
Appellants

v.

REALPAGE INC., d/b/a ONSITE;
RP ON SITE, LLC.

_____

On Appeal from the District Court for the
Eastern District of Pennsylvania
(E.D. Pa. No. 2-19-cv-01706)
United States District Judge: Honorable Joshua D. Wolson
_____
Argued December 15, 2021

Before: GREENAWAY, JR., KRAUSE, and PHIPPS, *Circuit Judges*

(Opinion Filed: August 24, 2022)

Lauren K.W. Brennan
James A. Francis
John Soumilas [*ARGUED*]
Francis Mailman Soumilas
1600 Market Street
Suite 2510
Philadelphia, PA 19103

      *Counsel for Appellants*


Ronald I. Raether, Jr.
Troutman Pepper
5 Park Plaza
Suite 1400
Irvine, CA 92614

Misha Tseytlin [*ARGUED*]
Troutman Pepper
227 West Monroe Street
Suite 3900
Chicago, IL 60606

      *Counsel for Appellees*

Mark W. Mosier
Covington & Burling
850 10th Street, N.W.
One City Center
Washington, DC 20001

      *Counsel for Amici Curiae Consumer Data
      Industry Association and Professional
      Background Screening Association*

Nicole A. Saharsky
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006

*Counsel for Amicus Curiae Chamber of
Commerce of the United States of America*

_____

**OPINION**

_____

KRAUSE, *Circuit Judge*.

In late 2018, Appellants Kevin Kelly and Karriem Bey found themselves in just the sort of frustrating predicament the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*., was designed to avoid, *see* J.A. 5. Their rental applications were denied based on inaccurate consumer reports generated by a consumer reporting agency, RealPage, Inc. RealPage would not correct the reports unless Appellants obtained proof of the error from its sources; and the identity of RealPage's sources was not included in the disclosures to Appellants, despite their requests for their files. So Appellants availed themselves of the remedy Congress provided and sued RealPage, claiming it had violated its obligation under the FCRA to disclose on request "[a]ll information in the consumer's file at the time of the request" and "[t]he sources of th[at] information." 15 U.S.C. § 1681g(a). Appellants sought damages and attorneys' fees not only for themselves but also on behalf of a purported class and subclass.

3

The class action did not get far. The District Court denied Appellants' motion for class certification on the grounds that Appellants failed to satisfy Rule 23(b)(3)'s predominance and superiority requirements and that their proposed class and subclass were not, in any event, ascertainable. For the reasons explained below, we disagree, and because the Court based its predominance analysis on a misinterpretation of Section 1681g(a) and erred in applying our ascertainability precedent, we will vacate and remand.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

To place the parties and their interactions in context, we begin with a brief overview of the FCRA before recounting the history of this case.

## A.  The Fair Credit Reporting Act

In the FCRA, Congress sought to address the problem of "inaccurate or arbitrary information" in consumer reports by requiring credit reporting agencies ("CRAs")[1] to "utilize accurate, relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)); *see also Bibbs v. Trans Union LLC*, — F.4th —, 2022 WL 3149216, at *3 (3d Cir. 2022) (explaining that, in enacting the FCRA,

---

[1] The FCRA defines a "consumer reporting agency" as any individual or entity that regularly "assembl[es] or evaluat[es] consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f).

Congress intended to "protect consumers from the transmission of inaccurate information about them" (quotation omitted)). It defined a "consumer report" to encompass "any . . . communication of any [consumer] information by a consumer reporting agency . . . which is used or expected to be used" to establish the consumer's eligibility for credit, employment, or another purpose. 15 U.S.C. § 1681a(d). Then, to advance its "consumer oriented objectives," *Guimond*, 45 F.3d at 1333, Congress specified the groups of third-party "users" to whom CRAs could disclose consumer reports, *e.g.*, *id.* §§ 1681b, 1681e(a), the different categories of information that must be omitted from or included in consumer reports procured by different users, *e.g.*, *id.* §§ 1681c, 1681f, and the responsibilities of such users once they procured those reports from CRAs, *e.g.*, *id.* § 1681e; 12 C.F.R. § 1022.137.

But the FCRA also sought to address another problem: the consumer's "lack of access to the information in [her] file [and] the difficulty in correcting inaccurate information." *Cortez*, 617 F.3d at 706 (internal quotation marks omitted) (quoting S. Rep. No. 91–517, at 3 (1969)). To that end, it broadly defined "file" to mean "all of the information on th[e] consumer recorded and retained by a consumer reporting agency regardless of how the information is stored," 15 U.S.C. § 1681a(g), and it required CRAs, upon request, to "clearly and accurately disclose to the consumer" six enumerated categories of information, including "[a]ll information in the consumer's file at the time of the request" and "[t]he sources of [that] information."[2] 15 U.S.C. § 1681g(a)(1), (a)(2). In addition to

---

[2] The six categories of information CRAs are required to disclose to the consumer upon request are: (1) "[a]ll information in the consumer's file at the time of the request

specifying the "[c]onditions and form of disclosure to consumers," *id.* § 1681h, and the procedures for consumers to dispute "the completeness or accuracy of any item of information . . . in a consumer's file" with a CRA, *id.* § 1681i, Congress also gave consumers a powerful remedy to enforce their rights by creating private causes of action, for both willful and negligent violations of the FCRA, including statutory damages and attorney's fees. 15 U.S.C. §§ 1681n, 1681o; *see Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 323 (3d Cir. 2018) ("Congress granted the consumer a right to receive a copy of his report before adverse action is taken, and provided for statutory damages plus attorney's fees for willful noncompliance[.]").

## B.     RealPage's Rental Reports

RealPage is a CRA that specializes in providing property managers with consumer reports, which it terms "Rental Reports," to help them evaluate their prospective tenants. *See* 15 U.S.C. § 1681a(f); J.A. 3–4. To generate

---

. . ."; (2) "[t]he sources of the information . . ."; (3) "[i]dentification of each person . . . that procured a consumer report . . ."; (4) "[t]he dates, original payees, and amounts of any checks upon which is based any adverse characterization of the consumer, included in the file at the time of the disclosure"; (5) "[a] record of all inquiries received by the agency during the 1-year period preceding the request that identified the consumer in connection with a credit or insurance transaction that was not initiated by the consumer"; and (6) "[i]f the consumer requests the credit file and not the credit score, a statement that the consumer may request and obtain a credit score." 15 U.S.C. § 1681g(a).

6

Rental Reports for those clients over the Class Period,[3] RealPage collected public-record information, including criminal records and eviction filings, from third-party vendors like LexisNexis and HygenicsData, stored that information in its own databases, and compiled it to respond to client requests. J.A. 3. A client procuring a Rental Report could also instruct RealPage to make a courtesy copy of that report available to the prospective tenant, who would then be notified of the option to download the Rental Report from RealPage's website. J.A. 179.

Consistent with its obligations under the FCRA, RealPage also disclosed information in response to consumers' direct requests for their files, which could be submitted in two ways. For one, a consumer could use a form on RealPage's website to request a "report and any of the disclosures required by the federal Fair Credit Reporting Act." Appellants' Br. 23 (emphasis omitted); Appellees' Br. 47. In that case, the form would automatically generate an email sent to a dedicated email inbox maintained by RealPage, and RealPage would manually process the request. J.A. 80, 134, 180. Alternatively, a consumer could personally contact a RealPage representative by phone, letter, or email to request their information. J.A. 179–80.

As it turned out, however, regardless of whether a consumer downloaded her courtesy copy of a Rental Report requested by a property manager or initiated her own independent request for her information on file, RealPage provided the consumer with the exact same report, the Rental

---

[3] The Class Period is September 26, 2017 through November 30, 2019. J.A. 6.

Report—which did not disclose the third-party-vendor "sources of the information."[4] 15 U.S.C. § 1681g(a)(2). J.A. 4, 117–18, 124.

## C.    The Parties

Appellants Kevin Kelly and Karriem Bey are two prospective tenants whose Rental Reports contained inaccuracies and who therefore sought information from RealPage to try to correct those errors. J.A. 5. After Kelly and Bey submitted lease applications for apartments at different properties, the respective property managers requested Appellants' consumer reports from RealPage. In response, RealPage generated and sent their clients Appellants' Rental

---

[4] Specifically, Appellants allege that RealPage violated § 1681g(a)(2) by failing to disclose the identity of third-party vendors who supplied it with public-record information. Appellants' Br. 7. RealPage counters that the statute only requires it to disclose the *original* sources of the public records included in its reports, *e.g.*, the court that generated a given criminal record, and that third-party vendors who simply aggregate such public records, like LexisNexis and HygenicsData, do not qualify as "sources" within the meaning of the FCRA. *See* 15 U.S.C. § 1681g(a)(2); Appellee's May 26, 2021 Supp. Ltr. Ex. A at 7. The merits of these arguments are beyond the scope of this interlocutory appeal, and we express no opinion on whether the term "sources" in § 1681g(a)(2) covers a CRA's third-party vendors. *See infra* note 8. For purposes of reviewing the District Court's denial of class certification, however, we will assume the correctness of Appellants' definition and will refer to third-party vendors in this opinion as "sources."

8

Reports, each of which contained inaccurate public record information. Kelly's report mistakenly included two DUI convictions and a record of an outdated vehicle inspection tag, the latter of which the report described as a misdemeanor conviction rather than a non-criminal summary offense. J.A. 5, 34–43. Bey's report incorrectly stated that a civil action for possession was filed against him and included an erroneous eviction filing. J.A. 5, 51–54. Not surprisingly, the property managers turned down both Appellants, although in Kelly's case, the manager eventually relented. *See* J.A. 5, 199–200, 243 (testifying that the only apartment Bey could move into was public housing in a different apartment building).

Upon learning of the inaccuracies in their reports, Kelly and Bey contacted RealPage, hoping to determine the sources of the errors and to correct them. Kelly made requests both using the form on RealPage's website that requested a "report and any of the disclosures required by the federal Fair Credit Reporting Act," Appellants' Br. 23 (emphasis omitted), and by mailing a written request to RealPage for "a copy of all of the information that [was] in [his] file." J.A. 204, 144–45. Bey called RealPage to "let [him] get [his] file" so that he could "correct" the errors. J.A. 233–35. What both Appellants received was simply the Rental Report that RealPage provided to the property manager, J.A. 231–33, and neither Rental Report identified the third-party vendors that sourced the inaccurate records to RealPage. J.A. 33-43, 50-54. Yet without proof from accurate records, RealPage refused to alter the information on the Rental Reports, and without the identity of the third-party vendors, neither Kelly nor Bey could obtain that proof. *See, e.g.*, J.A. 235–38.

Both Appellants attempted unsuccessfully to obtain proof elsewhere and both suffered adverse consequences. Bey

9

attempted to obtain the records from a public source, but he was denied access because those records had been sealed. *Kelly v. RealPage, Inc.*, No. 2:19-cv-1706, ECF #44-15 at ¶ 6 ("Bey Decl.") (E.D. Pa. July 10, 2020); J.A. 235–38. As a result of the inaccurate eviction record, he was only able to live in public housing. J.A. 235–38, 241–43. Kelly also struggled to locate court records of the crimes that had been wrongly attributed to him because the case numbers listed in his Rental Report were inaccurate, and the mislabeling of the inspection violation as a misdemeanor is the type of error that could only originate with the third-party vendor (or RealPage), not the original source. Kelly Decl. ¶¶ 5–6; *see* J.A. 38, 80, 196–98. Although Kelly was ultimately approved for the apartment, the error "needlessly wasted [his] time" and caused him "confus[ion]" and "unnecessary distress." *Kelly v. RealPage, Inc.*, No. 2:19-cv-1706, ECF #44-14 at ¶ 8–9 ("Kelly Decl.") (E.D. Pa. July 10, 2020). In addition, without the source information, neither Kelly nor Bey was able to get RealPage to correct the errors. *Id.* at ¶ 9; *see, e.g.*, J.A. 204–05, 215.[5]

D.    **The Proceedings Below**

In April 2019, Kelly and Bey initiated this putative class action against RealPage, alleging, among other things, willful and negligent violations of Section 1681g. *See* 15 U.S.C. §§ 1681n, 1681o; *Kelly v. RealPage, Inc.*, No. 2:19-cv-1706, ECF #1 (E.D. Pa. Apr. 19, 2019). They sought to represent consumers who received Rental Reports during the Class

---

[5] RealPage declined either to admit that the inaccuracies were caused by its own errors of attribution or to disclose information on its sources to Kelly or Bey until after they initiated this lawsuit. J.A. 60, 143, 218–20.

Period that included public-record information but failed to name the third-party vendors who provided it to RealPage. J.A. 6. In practice, any consumer whose report included public records fit this description because, as RealPage has acknowledged, none of the Rental Reports produced during the Class Period identified third-party vendors, and RealPage provided the same report to consumers, whether as a courtesy copy of the Rental Report made available at the request of RealPage's client, or on direct request of the consumer for her file. J.A. 126.

After RealPage answered the complaint, Kelly and Bey moved to certify the following class and subclass:

- an "All Requests" class, including individuals "who had a Rental Report sent or caused to be sent to them by RealPage, Inc. through its On-Site operation which did not include the name of the private vendor source(s) from which public record information in the file was obtained" within the Class Period; and,

- a "Direct Requests" subclass consisting of individuals in the All Requests class who received a Rental Report "following a documented direct request by the consumer" to RealPage or On-Site.

J.A. 74–75.

These class definitions reflect the three different methods by which putative class members could have received their Rental Reports during the Class Period, *i.e.*, as a courtesy copy of the property manager's report; through a consumer's

11

direct request using the request form RealPage provided on its website; or through a direct request by correspondence or documented call. *See* J.A. 179–80. Approximately 2.2 million consumers, comprising the All Requests class, received copies of their Rental Reports through one or more of these methods during the Class Period. J.A. 4. The Direct Requests subclass includes only a subset of these consumers: the 16,659 consumers who obtained their Rental Reports using the website form, J.A. 56, plus those who submitted requests via documented calls, letters, or emails.[6]

In deciding Appellants' motion for class certification, the District Court first addressed the issue of standing. RealPage sought to have the motion denied and the complaint dismissed on the ground that Appellants had failed to allege a concrete injury. But the District Court rejected that argument, holding that the deprivation of information to which Appellants claimed to be legally entitled was a cognizable injury for purposes of Article III standing. J.A. 10.

On the merits of the class certification motion, however, the District Court sided with RealPage, declining to certify either the All Requests class or the Direct Requests subclass. Appellants, the Court recognized, had the burden to establish "the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure," *i.e.*, "numerosity, commonality, typicality,

---

[6] The All Requests class may be overinclusive because consumers could have received their Rental Reports via multiple methods. For example, Bey was presumably counted twice because he received a copy of his Rental Report both as a courtesy copy of the property manager's request and through a direct request via telephone. J.A. 231–35.

and adequacy," as well as Rule 23(b)(3)'s "additional requirements that '[common] questions of law or fact . . . predominate over any questions affecting only individual members' and that 'a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Gonzalez v. Corning*, 885 F.3d 186, 192 (3d Cir. 2018) (quoting Fed. R. Civ. P. 23(b)(3)). In addition, the proposed class must be "ascertainable," meaning it must be "defined with reference to objective criteria," and there must be "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)).

Here, the Court held that Appellants failed to establish predominance and superiority and that neither class was ascertainable. Fundamental to the District Court's analysis was its interpretation of Section 1681g(a) as imposing a disclosure obligation on CRAs only when (1) the consumer makes a direct request of the CRA, and (2) that consumer specifically requests her "file" and not merely her "report." J.A. 12–13. Applying that interpretation, the Court held that individual questions regarding whether consumers' requests were direct or indirect and whether consumers requested their "files" or "reports" would predominate over common questions, preventing the class action from being superior to individual actions. J.A. 19–23. The Court also concluded that neither the class nor the subclass was ascertainable because identifying class members would require determining which Rental Reports contained public record information and thus would require "[a] review of each individual file [which] is, of course, not administratively feasible." J.A. 15–16.

13

Appellants filed a Motion for Reconsideration, arguing in relevant part that the District Court erred in its ascertainability determination because the "presence or absence of public records is objectively determinable from the face of the reports." J.A. 283. Appellants also pointed to evidence in the existing record that RealPage retained copies of the Rental Reports in a "searchable electronic format," and submitted additional testimony from RealPage—obtained after the class certification briefing—that the data is "stored in a database that can be queried to retrieve these reports." *Id.* The Court denied the motion, rejecting what it described as a "bald assertion . . . as to how [Appellants] would conduct the computer-aided administrative task" of identifying the proposed class members and declining to consider Appellants' explanation on the ground that it had only been raised in a footnote, which it declined to consider pursuant to its individual rules. J.A. 29, 31, 84.

Appellants also sought leave to redefine the subclass and to file a renewed motion for class certification to address the District Court's ascertainability and predominance concerns in light of the Court's novel interpretation of § 1681g(a). J.A. 288–90. Construing that request as a motion to amend the scheduling order, the District Court denied it for lack of diligence, concluding that Appellants "had or could have obtained all of the information on which they base their reconsideration motion before the Court ruled on class certification." J.A. 30.

Appellants then filed a petition for interlocutory review under Rule 23(f) of the Federal Rules of Civil Procedure, which we granted. J.A. 1.

14

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p because Appellants assert claims under 15 U.S.C. § 1681g(a). We have jurisdiction to review the District Court's order denying class certification under 28 U.S.C. § 1292(e) and Rule 23(f) of the Federal Rules of Civil Procedure.

We review an order denying class certification "for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2009)). We review legal standards applied by the District Court *de novo*. *Byrd*, 784 F.3d at 161; *see also McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 222 n.9 (3d Cir. 2012) (standard of review for standing on Rule 23(f) appeal is plenary).

## III. DISCUSSION

RealPage argues that Appellants lack a sufficiently concrete injury to satisfy the Supreme Court's standing requirements, while Appellants challenge the District Court's grounds for denying class certification. We first address whether Appellants established standing before discussing the District Court's rulings on predominance and ascertainability.

15

## A. Standing[7]

The District Court held that RealPage's failure to disclose source information was cognizable as an

---

[7] Our appellate jurisdiction on interlocutory review is typically "confined to review of that order," *O'Hanlon v. Uber Techs., Inc.*, 990 F.3d 757, 761 (3d Cir. 2021), but here, we can and must consider RealPage's challenge to Appellants' Article III standing because that is a "necessary threshold issue to our review of an order denying class certification," *McNair*, 672 F.3d at 223 n.10; *cf. O'Hanlon*, 990 F.3d at 763 (observing, outside the class action context, that where a plaintiff is determined to have standing by a district court, "'our power to adjudicate [the standing-to-sue] issue on an interlocutory basis is limited' to pendent appellate jurisdiction" (alteration in *O'Hanlon*) (quoting *Griswold v. Coventry First LLC*, 762 F.3d 264, 269 (3d Cir. 2014)).

However, we will not accept RealPage's request that we address the District Court's rulings on personal jurisdiction and partial summary judgment, Appellee's Br. 54–65; Appellee's May 26, 2021 Supp. Ltr. 1, because those two issues are beyond the scope of "Rule 23(f) inquiries." *McKowan Lowe & Co. v. Jasmine, Ltd.*, 295 F.3d 380, 390 (3d Cir. 2002). In any event, RealPage's personal jurisdiction argument, premised on the Supreme Court's recent decision in *Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773 (2017), is foreclosed by our recent decision in *Fischer v. Fed. Express Corp.*, — F.4th —, 2022 WL 2922359, at *5 (3d Cir. 2022) ("[W]e agree with many of our colleagues across the appellate and trial benches who [have held] that *Bristol-Myers* did not

"informational injury" that conferred standing on Appellants under *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). *See* J.A. 10–11, 21. Since then, however, the Supreme Court decided *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), providing additional guidance regarding the concreteness requirement and prompting RealPage to renew its standing challenge on appeal. Appellees' Br. 22–31.

To establish standing, a plaintiff—whether acting in her individual capacity or as a putative class representative—bears the burden of establishing: "(1) an injury-in-fact; (2) that is fairly traceable to the defendant's challenged conduct; and (3) that is likely to be redressed by a favorable judicial decision." *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 356 (3d Cir. 2018) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992)); *see also Spokeo*, 578 U.S. at 338 n.6. At issue here is the first element of injury-in-fact, and specifically, the requirement that the alleged injury be concrete—that is, "real" as opposed to "abstract," *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 340), "even in the context of a statutory violation," *Spokeo*, 578 U.S. at 341. We first consider what showing of concreteness is required under the Supreme Court's informational injury cases and then address whether, under that case law, Appellants have established such an injury.

### a. The Informational Injury Doctrine

With the rapid onset of the Information Age, the Supreme Court's jurisprudence on standing to challenge the

change the personal jurisdiction question with respect to class actions." (collecting cases)).

17

denial of information subject to disclosure has evolved rapidly as well. In this context, the Supreme Court has repeatedly recognized that an "informational injury," where a plaintiff alleges that she "failed to receive . . . information" to which she is legally entitled, is sufficiently concrete to confer standing. *TransUnion*, 141 S. Ct. at 2204, 2214; *see also Spokeo*, 578 U.S. at 340–42; *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24–25 (1998); *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989).

Drawing on the Court's most recent pronouncements in *TransUnion*, RealPage argues that Appellants fail to state an informational injury because they allege only a "bare procedural violation" and "identified no downstream consequences" from the omitted source information, Appellees' Br. 26, 30 (quoting *TransUnion*, 141 S. Ct. at 2213–14).[8] RealPage would have us hold that Appellants

---

[8] RealPage also argues that Appellants lack standing because there is no historical analogue to their injury. Appellees' Br. 27–28. Although in *TransUnion* the Supreme Court explained that certain other types of intangible harms require "a 'close relationship' to [] harm[s] 'traditionally' recognized as providing a basis for a lawsuit in American courts," *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 341), we do not understand *TransUnion*'s passing discussion of informational injury, nor any other informational injury case, to import a historical analogue requirement into the standing analysis for informational injury claims. *See id.* at 2214; *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1100 (9th Cir. 2022) (explaining that *TransUnion* does not prevent determination that an allegation of nondisclosure in violation of Section 1681g is sufficiently concrete); *Trichell v.*

failed to establish the requisite "downstream consequences" because they did not act on the source information after RealPage disclosed it in discovery. Appellees' Br. 28–30. The upshot is that RealPage's interpretation of *TransUnion* would, in essence, limit the informational injury doctrine to the facts of the Court's prior informational injury cases.

But *TransUnion* did not cast doubt on the broader import of those decisions. In fact, the Court cited *Public Citizen* and *Akins* with approval, reaffirming their continued viability and putting *TransUnion* in context. *See TransUnion*, 141 S. Ct. at 2214. These earlier cases show that "a plaintiff suffers an 'injury in fact' when [she] fails to obtain information which must be publicly disclosed pursuant to a statute," *Akins*, 524 U.S. at 21 (citing *Public Citizen*, 491 U.S. at 449), and that an informational injury is sufficiently concrete where the failure to disclose is "directly related to" to the purpose of the statute, *id.* at 24–25. In those cases, the Court explained that, as with documents wrongly withheld in response to a Freedom of Information Act ("FOIA") request, "those requesting information under [the statute] need show [only] that they sought and were denied specific agency records." *Public Citizen*, 491 U.S. at 449 (collecting cases). Thus, under *Akins* and *Public Citizen*, a plaintiff need only allege that she was

*Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004–05 (11th Cir. 2020) (rejecting the contention that plaintiffs had stated an informational injury but not imposing a historical analogue requirement); *see also Laufer v. Arpan LLC*, 29 F.4th 1268, 1273–74 (11th Cir. 2022) (finding intangible injury despite lack of common law analogue where plaintiff pleaded concrete stigmatic injury causing "frustration and humiliation" and a "sense of isolation and segregation").

denied information to which she was legally entitled, and that the denial caused some adverse consequences related to the purpose of the statute.

*Spokeo*, which immediately preceded *TransUnion*, made a similar point. Like the Court in *TransUnion*, the *Spokeo* Court cited *Public Citizen* and *Akins* with approval, explaining that a plaintiff "need not allege any *additional* harm beyond the one Congress has identified" in enacting the statute, contrasting the situation where, for example, a consumer reporting agency provided information that was "entirely accurate" and merely "fail[ed] to provide the required notice to a user of the agency's consumer information." 578 U.S. at 342. That injury wouldn't be sufficiently concrete because, notwithstanding the CRA's failure to give the proper notice, the consumer's alleged "injury" would not arise from the harm Congress sought to prevent in the FCRA: namely, having incorrect information disseminated without notice or consent. *Id.*

In *TransUnion*, the Supreme Court applied this framework to its passing analysis of informational injury. It rejected an argument that the plaintiffs had suffered an informational injury under *Public Citizen* and *Akins* when TransUnion allegedly failed to provide them with required disclosures in a format specified by the FCRA. 141 S. Ct. at 2214. Unlike their counterparts in its earlier informational injury cases, the Court reasoned that the *TransUnion* plaintiffs "did not allege that they failed to receive any required information[, t]hey argued only that they received it *in the wrong format*." *Id.* Also in contrast to the Court's earlier cases, the *TransUnion* plaintiffs had not alleged "adverse effects" such as "downstream consequences" of the omission. *Id.* (quotation omitted). Thus, the Court did not amend the

informational injury doctrine in *TransUnion*; rather, it simply applied its prior precedent and determined that two critical requirements for establishing an informational injury were lacking: (1) the denial of information and (2) some consequence caused by that omission.[9]

Whether framed as "adverse effects" or a "downstream consequence[]," *TransUnion*, 141 S. Ct. at 2214, the upshot is the same: a plaintiff seeking to assert an informational injury must establish a nexus among the omitted information to which she has entitlement, the purported harm actually caused by the specific violation, and the "concrete interest" that Congress identified as "deserving of protection" when it created the disclosure requirement. *Tailford v. Experian Info. Sols., Inc.*, 26 F.4th 1092, 1100 (9th Cir. 2022); *see also TransUnion*, 141 S. Ct. at 2214. Notably, in none of these cases were the plaintiffs required to allege or prove that they would do anything with the information once disclosed, nor did

---

[9] Similarly, the Court in *TransUnion* favorably cited *Trichell v. Midland Credit Management*, where the Eleventh Circuit distinguished *Akins* and *Public Citizen* on the grounds that those cases involved statutes that created "substantive entitlement to receive information" and plaintiffs who "identified consequential harms from the failure to disclose the contested information." 964 F.3d at 1004. By contrast, the *Trichell* plaintiffs complained "not that they sought and were denied desired information" or that they were actively misled, "but that they received unwanted communications that were misleading and unfair" and these communications "had no impact on them." *Id.*

*TransUnion* suggest that a plaintiff's failure to act on the information, if disclosed, would be dispositive.

In the wake of *TransUnion*, other Courts of Appeals have likewise concluded that "depriv[ation] of information to which [one] is legally entitled" constitutes a sufficiently concrete informational injury when that omission causes "adverse effects" and the information has "some relevance" to an interest of the litigant that the statute was intended to protect. *Laufer v. Looper*, 22 F.4th 871, 880–81 & n.6 (10th Cir. 2022) (quoting *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 654 (4th Cir. 2019)); *see also Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022) (same); *Laufer v. Arpan LLC*, 29 F.4th 1268, 1280–82 (11th Cir. 2022) (Jordan, J., concurring) (describing *Public Citizen* and *Akins* as requiring an omission of information and concomitant "downstream consequences"). In the FCRA context in particular, our sister circuits have found non-disclosure a sufficiently concrete injury where it prevented the plaintiff from receiving "fair and accurate reporting of their credit information," *Tailford*, 26 F.4th at 1100, or affected their ability to "obtain the information [they] needed to cure [their] credit issues, [or] ultimately resolve those issues," *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 347 (4th Cir. 2017).

In sum, rather than working a sea change to its informational injury jurisprudence, the Supreme Court in *TransUnion* simply reiterated the lessons of its prior cases: namely, to state a cognizable informational injury a plaintiff must allege that "they failed to receive . . . required information," and that the omission led to "adverse effects" or other "downstream consequences," *TransUnion*, 141 S. Ct. at 2214 (internal quotation omitted), and such consequences have

22

a nexus to the interest Congress sought to protect, *Spokeo*, 578 U.S. at 342.

### b.      Appellants Have Standing

Applying these precepts here, Appellants have standing because they have made the requisite showing of (1) the omission of information to which they claim entitlement, (2) "adverse effects" that flow from the omission, and (3) the requisite nexus to the "concrete interest" Congress intended to protect.

As to the first requirement, the FCRA creates a "substantive entitlement" to the disclosure of source information, *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020), in order to empower consumers to avoid "being unjustly damaged because of inaccurate or arbitrary information in [their] credit report[s]," *Cortez*, 617 F.3d at 706 (quoting S. Rep. No. 91–517, at 1 (1969)). And unlike *TransUnion* where the plaintiffs alleged only a "formatting violation," 141 S. Ct. at 2214, or *Trichell* where the plaintiffs alleged only that they "received unwanted communications that were misleading and unfair," 964 F.3d at 1004, Appellants here claim that they sought disclosure of information "to which [they were] legally entitled," *Looper*, 22 F.4th at 880, and that RealPage failed to disclose that information. *See* J.A. 10–11. Specifically, Appellants requested a file disclosure pursuant to 1681g(a), which requires RealPage to disclose, among other things, "[t]he sources of the information" contained in that file, 15 U.S.C. § 1681g(a)(2), and RealPage produced the Rental Reports it generated for its clients, which did not disclose the third-party vendors from which it gathered its information.

23

Appellants also satisfy the second requirement by alleging that the omission of this third-party vendor information had "adverse effects." *TransUnion*, 141 S. Ct. at 2214 (quoting *Trichell*, 964 F.3d at 1004). There were errors in their files—Kelly's report erroneously included two DUI convictions and a misdemeanor conviction for an outdated inspection tag, while Bey's mistakenly included a civil action for possession and an eviction filing, J.A. 5, 34–43, 51–54—and the omission of RealPage's sources allegedly impaired their ability to correct these errors. *See* J.A. 204–05, 215, 235–38, 241–43; Kelly Decl. ¶¶ 5–6, 8–9; Bey Decl. ¶ 5–6. Neither Kelly nor Bey ever convinced RealPage to correct their reports; both were denied the apartments for which they applied; the error caused Kelly to "needlessly waste[] [his] time" and caused him "confus[ion]" and "unnecessary distress," Kelly Decl. ¶ 9, and Bey, allegedly due to the error, has only been able to secure public housing. *See* J.A. 204–05, 215, 235–38, 241–43. The omissions thus directly "affected [Appellants'] conduct" by impairing their ability to "obtain the information [they] needed to cure [their] credit issues, and ultimately resolve those issues." *Dreher*, 856 F.3d at 347.

Finally, RealPage's failure to disclose the third-party vendor information satisfied the third requirement by preventing Appellants from obtaining "fair and accurate reporting of their credit information," *Tailford*, 26 F.4th at 1100, frustrating Congress's goal of empowering consumers to "correct[] inaccurate information" in their credit files and preventing them "from being unjustly damaged because of inaccurate or arbitrary information in [their] credit report[s]," *Cortez*, 617 F.3d at 706 (internal quotations omitted).

And contrary to RealPage's contention, whether Appellants would have taken action on the third-party vendor

24

information if disclosed is irrelevant.[10]  A consumer cannot know *ex ante* the source of a potential error in their file, whether an underlying source of the CRA itself is responsible for the error, or what may be required to obtain a correction. That is the very purpose of the disclosure requirement.  *See Cortez*, 617 F.3d at 706.  It is therefore enough for standing purposes for plaintiffs to allege that, as a result of an omission, they experienced the adverse effects of being "unable to . . . ensure fair and accurate reporting of their credit information." *Tailford*, 26 F.4th at 1100.

Appellants have made those allegations here, so we uphold the District Court's determination that Appellants have standing.

## B.    Class Certification

Though we agree with the District Court's standing analysis, we disagree, at least in part, with its bases for denying class certification, predominance, and ascertainability.

### a.    Predominance[11]

We begin with predominance.  To determine whether this requirement is satisfied, a court must engage in a "rigorous

---

[10] To be clear, it was not until Appellants initiated this lawsuit that RealPage disclosed the missing information or admitted fault for the errors, which remain uncorrected.  J.A. 60, 143, 218–20.

[11] The District Court determined that the "superiority analysis and the predominance inquiry are bound together." J.A. 22.  Having concluded that "trial of this case [would]

assessment" of whether common evidence may be used to prove "the essential elements of the claims brought by a putative class." *Gonzalez*, 885 F.3d at 195 (citing *In re Hydrogen Peroxide*, 552 F.3d at 311–12). Here, the District Court identified two essential elements that it concluded could not be proven with common evidence, each of which we address below: (1) that the request triggering the obligation was a direct request from the consumer, and not the property manager's request that the consumer be sent a courtesy copy of a Rental Report; and (2) that the consumer expressly requested her "file," and not for example, her "report" or her "information." J.A. 19, 20–21.

---

require substantial individual inquiry," the Court held that a "class action [would] not [be] a superior method of resolving [the case] because the individual nature of the inquiries would be time-consuming and inefficient." J.A. 22–23. We agree that there is substantial overlap in the superiority and predominance inquiries. Indeed, they have been described as the "twin requirements" of Rule 23(b)(3), which were both "adopted 'to cover cases in which a class action would achieve economies of time, effort, and expense . . . without sacrificing procedural fairness.'" *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 186 (3d Cir. 2001) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). And, because the District Court grounded its analysis of superiority in its finding that predominance had not been satisfied, we will leave it to the District Court on remand to reconsider superiority in light of this discussion.

*1.     Does Section 1681g(a) Require a Direct Request from a Consumer to Trigger Disclosure Obligations?*

Section 1681g, entitled "Disclosures to consumers," delineates the six categories of disclosures a CRA must make to the consumer "upon request," but it does not state explicitly that this request must be made by the consumer.  15 U.S.C. § 1681g(a).  That omission, Appellants contend, shows that "Congress . . . contemplate[d] [that] indirect requests as well [as direct requests]" would trigger a CRA's disclosure obligation under § 1681g(a).  Appellants' Br. 16.  As applied here, Appellants posit that RealPage's disclosure of a courtesy copy of its client's Rental Report "upon request" of the client requires the same file and source disclosures as a consumer's direct request for her file, so the District Court erred in concluding that the identity of the requesting party was an individualized issue that would predominate.  *See id*.; Reply Br. 14.

We have never addressed the question whether § 1681g(a)'s disclosure obligations may be triggered by an indirect request from a third party as well as by a direct request by the consumer.  Nor, to our knowledge, has any other federal court, though several have assumed that § 1681g(a) only applies when consumers request their files directly.[12]  We do

[12] *See, e.g.*, *Nunnally v. Equifax Info. Servs., LLC*, 451 F.3d 768, 774 (11th Cir. 2006) ("Under subsection (a)(1), a consumer reporting agency must disclose 'all information in the consumer's file' *upon a consumer's request*." (emphasis added)); *Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d 199, 209 (D. Conn. 2013) ("[S]ection 1681g allows a consumer to

27

so today, however, and conclude that Appellants' reading is wrong as a matter of law. "[R]equest" in § 1681g(a) does refer exclusively to direct requests from consumers, and thus, the All Requests class cannot satisfy predominance.

The text of the FCRA makes this clear in a number of ways. First and foremost, it appears that property managers' requests that Appellants receive courtesy copies do not implicate § 1681g at all. Rather, entirely different sections of the FCRA authorize a "user" of a consumer report to request a consumer report, § 1681b; *see also Bibbs*, — F.4th at — , 2022 WL 3149216, at *5 (examining the "range of permissible users" under the FCRA), and to "disclos[e] the contents of the report to the consumer," at least if an adverse action has been taken by the user based "on the report," § 1681e(c).[13] And for

_____

review the contents of their file by requiring a consumer reporting agency to 'clearly and accurately disclose to the consumer,' *upon the consumer's request*" (emphasis added)); *Slyzko v. Equifax Info. Servs. LLC*, 2020 WL 1433518, at *3 (D. Nev. Mar. 23, 2020) ("FCRA § 1681g(a) requires a consumer reporting agency to, *'upon [the] request' of a consumer* who furnishes proper identification, 'clearly and accurately' disclose six categories of information." (emphasis added)); *see also Cisneros v. U.D. Registry, Inc.*, 46 Cal. Rptr. 2d 233, 249 (Cal. Ct. App. 1995) (holding that "requests for disclosure [must] come from the consumer personally rather than from his or her representative," including an attorney authorized to make the request).

[13] In full, Section 1681e(c) provides that "[a] consumer reporting agency may not prohibit a user of a consumer report furnished by the agency on a consumer from disclosing the

today, we need not decide whether a "user" may only disclose a report to the consumer after "an adverse action" has been taken against that consumer, nor whether § 1681e(c) allows a "user" to not only disclose a copy but also to cause it to be disclosed, as the property managers did here through their instructions to RealPage. J.A. 179–180. It is sufficient for our purposes that Congress made clear when a third party like a property manager could request and disclose a "courtesy copy" of the report to the consumer, and it made no such provision in § 1681g(a). *See Gallardo ex rel. Vassallo v. Marstiller*, 142 S. Ct. 1751, 1759 (2022) ("[W]e must give effect to, not nullify, Congress' choice to include [] language in some [statutory] provisions, but not others" (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)). Thus, when property managers asked RealPage to send consumers courtesy copies of their Rental Reports, those requests fell within the ambit of § 1681e(c), rather than § 1681g.

The text of § 1681g confirms it relates only to direct requests of consumers. Subsection (a), for example, expressly states that a CRA's disclosure to a consumer is made "subject to section 1681h(a)(1)," which provides that, upon receiving a "request," a CRA must require "the consumer [to] furnish proper identification" before turning over her file. 15 U.S.C. § 1681h(a)(1). A third-party requester would be incapable of compliance with this prerequisite for disclosure. Section 1681g thus outlines a process by which the consumer, and the

---

contents of the report to the consumer, if adverse action against the consumer has been taken by the user based in whole or in part on the report." 15 U.S.C. § 1681e(c).

consumer alone, can make a request and trigger the CRA's specified disclosure obligations.

The enumerated categories of information that CRAs must "clearly and accurately disclose" upon request reinforce that reading, as several make provision for particular preferences of the requesting consumer. *Id.* § 1681g(a). For example, the first category covers "[a]ll information in the consumer's file . . . except that . . . if the consumer to whom the file relates requests that the first 5 digits of [her] social security number . . . not be included in the disclosure . . . the [CRA] shall so truncate [the] number," upon "appropriate proof of the identity of *the requester*." *Id.* § 1681g(a)(1)(A) (emphasis added). The third category is the identity of each person who procured a report and "upon request of the consumer, the address and telephone number of [such] person." *Id.* § 1681g(a)(3)(A)–(B). And the last category—a "statement that the consumer may . . . obtain a credit score"— is triggered only "[i]f the consumer requests [a] credit file and not the credit score." *Id.* § 1681g(a)(6). The plain language of each of these § 1681g(a) disclosures indicates that the requester and the consumer are one and the same.

Our construction of § 1681g(a) is also supported by contextual clues from surrounding sections. For example, in specifying the range of prices a CRA may charge for § 1681g disclosures, the statute is explicit that such disclosures are initiated at the request of the consumer. *Compare id.* § 1681j(a)(1) (explaining that the subset of CRAs classified as "[n]ationwide consumer reporting agencies" must make "disclosures pursuant to section 1681g" for free at least "once during any 12-month period *upon request of the consumer*" (emphasis added)), *and id.* § 1681j(b)–(d) (identifying particular instances when all other CRAs must make § 1681g

30

disclosures for free *"[u]pon the request of the consumer"* or when the "*the consumer makes a request*" (emphasis added)), *with id.* § 1681j(f) (explaining that CRAs may "impose a reasonable charge on [the] consumer" in connection with a Section 1681g disclosure "*[i]n the case of a request from a consumer*" that does not fit into one of the aforementioned categories (emphasis added)).

Likewise, the FCRA allows consumers to choose whether the § 1681g(a) disclosures are made in writing and whether they are delivered in person, by telephone, by electronic means, or by any other reasonable means available to the CRA. *Id.* § 1681h(b). There is no analogous provision for third-party requesters to designate the method of delivering to the consumer, *see Nken v. Holder*, 556 U.S. 418, 430 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432, (1987))), and in view of § 1681h(b), a CRA in receipt of a § 1681g(a) request from a third party would be unable to effect delivery on the consumer without the consumer's request in any event.

The sharp constraint on third parties' participation in the § 1681g disclosure process provides additional evidence that the FCRA does not empower such parties to cause the disclosure of a consumer's file to the consumer. Even when a consumer opts to review her file "accompanied by one other person of [her] choosing," that person "shall furnish reasonable identification," and the consumer may be required to "furnish a written statement granting permission to the [CRA] to discuss the consumer's file in such person's presence." 15 U.S.C. § 1681h(d). Such strictures on third-party involvement, even

in the consumer's presence, belie Appellants' contention that third parties have an unrestricted right to request that § 1681g(a) disclosures be made to the consumer.[14] *See* Appellants' Br. 16.

Finally, a comparison of § 1681g(a) with the FCRA sections dealing with disclosures to third-party users solidifies our conclusion. Section 1681g is entitled "Disclosures to consumers," and for the reasons we have explained, anticipates that the recipient is also the requesting party. So too do the sections governing disclosures to users. *See, e.g.*, *id.* § 1681b(b)(2) (covering disclosures to employers, providing that "a person may not procure a consumer report" for employment purposes without meeting certain conditions and having the consumer's "authoriz[ation] in writing"); *id.* § 1681b(a)(4) (disclosures to "the head of a State or local child support enforcement agency"); *id.* § 1681b(b)(4)(A) (disclosures to "an agency or department of the United States Government which seeks to obtain and use a consumer report" for employment purposes); *id.* § 1681f (explaining when "a consumer reporting agency may furnish identifying information respecting any consumer . . . to a governmental

---

[14] As amici helpfully note, construing § 1681g(a) to allow third parties to "control the entire request process" would also frustrate Congress's goal of protecting consumer privacy by making "the third party [] a key intermediary between the CRA and [the] consumer." Br. of Amici Curiae Consumer Data Indus. Ass'n and Pro. Background Screening Ass'n at 24. That goal is evidenced, in part, by "the lengths [] Congress went" toward safeguarding privacy concerns, including through § 1681h(a)(1) and § 1681h(d). *Id.* at 23.

agency"); *id.* § 1681u ("Disclosures to FBI for counterintelligence purposes").

It is also telling that these other sections specify when the consumer's authorization is needed and when the consumer may request disclosure to third parties, whereas § 1681g makes no similar express provision for third parties to request disclosures of information. *See, e.g., id.* § 1681b(a)(2) (providing that a CRA may "furnish a consumer report . . . [i]n accordance with the written instructions of the consumer to whom it relates"); *id.* § 1681b(c) (explaining that a CRA "may furnish a consumer report relating to [a] consumer . . . in connection with . . . [a] transaction that is not initiated by the consumer only if . . . the consumer authorizes the agency to provide such report to such person").

Notably, the disclosures that can be requested by third-party users are also far more circumscribed than those provided under § 1681g(a). *Compare id.* § 1681g(a)(1) (requiring disclosure of "[a]ll information in the consumer's file"), *with id.* § 1681b(a) (governing the provision of "consumer report[s]," which need not convey the full contents of the consumer's "file"). That makes it all the more implausible that Congress intended § 1681g(a) to dramatically expand third parties' disclosure authority by triggering a CRA's obligations simply "upon [a user's] request," particularly without saying so explicitly.

In sum, the text, context, and structure of the FCRA provide that the District Court was right to distinguish between consumers who made direct requests under § 1681g and consumers who received courtesy copies of the property managers' Rental Reports (presumably under § 1681e(c)). Only the former were entitled to the disclosure of all the

33

information in the consumers' files and the "sources" of that information. The All Requests class, however, consists of both types of consumers, so the District Court correctly concluded that the "essential element" of who made the request, *Gonzalez*, 885 F.3d at 196, could not be established "with common, as opposed to individualized, evidence," *Hayes*, 725 F.3d at 359 (citation omitted), and that certification of the All Requests class should therefore be denied.

> ### 2. Is Section 1681g(a)'s Disclosure Obligation Triggered Only by a Request for a "File"?

We next consider RealPage's argument that CRAs are relieved of their obligation to disclose their sources under Section 1681g(a) whenever a consumer uses a term other than "file" to make her request. The District Court concluded that was the case, reasoning that, by requiring a CRA to disclose "[a]ll information in the consumer's file at the time of the request," 15 U.S.C. § 1681g(a)(1), the statute makes a "distinction between a request for a file and a request for a consumer report," J.A. 13. The Court then denied class certification of even the Direct Requests subclass on the ground that the "individual issue [of] whether consumers wanted a complete file disclosure or just the disclosure of the consumer report that [RealPage] sent to a potential landlord" would predominate over class-wide issues because it would require individual "examin[ation] [of] each class member to determine what he or she intended to request." J.A. 21.

We read the statute differently. No doubt, the statute defines the terms, "file" and "consumer report" and gives them different meanings. *Compare* 15 U.S.C. § 1681a(g) (defining a "file" as containing "all of the information" that a CRA has "recorded and retained" about a consumer, "regardless of how

34

the information is stored"), *with id.* § 1681a(d)(1) (defining a "consumer report" as "any written, oral, or other communication of any information by a [CRA] bearing on a consumer's credit worthiness"). But the defining characteristic of § 1681g is not whether the consumer uses the word "file" or "consumer report," or even "records" or "information"; it is that the consumer is the one who makes the request. As a matter of common sense, a consumer's request for "my consumer report" effectively requests all the information the CRA is authorized to disclose under the statute, and under § 1681g(a), that includes among other things, all of the information in the consumer's file and the sources of that information. Nothing in the statute's text, context, purpose, or history indicates that any magic words are required for a consumer to effect a "request" under § 1681g(a) or that a consumer's request for "my consumer report" is any less effective at triggering the CRA's disclosure obligations than a request for "my file."

We begin with the statutory text, which—at least in the context of describing disclosures—does not specify that the subject of the request even be the "file." To the contrary, § 1681g(a) merely provides that a CRA must disclose six categories of information "upon request," with the term, "request" preceding all six enumerated categories. The most natural reading of this provision is, thus, that a single generalized "request" under § 1681g(a) entitles the consumer to all categories of information outlined in § 1681g(a)(1)–(6), only the first of which is the "file," and none of which, notably, provides for a separate disclosure of a "report." The text offers no support for the District Court's alternative reading, which would presumably require a consumer to make specific discrete requests for each of the six categories of disclosure,

35

limiting the CRA's disclosure obligation to the particular category expressly requested.

To the contrary, it is apparent that Congress used the terms "consumer report" and "file" interchangeably in § 1681g. For example, § 1681g(c)(2)(A) requires CRAs to provide a "summary of rights" in "each written disclosure . . . to the consumer." That summary must include a description of "the right of a consumer to obtain a copy of a *consumer report* under [Section 1681g(a)]." 15 U.S.C. § 1681g(c)(1)(B)(i), (c)(2)(A) (emphasis added). So, even within § 1681g, Congress described the contents of a Section 1681g(a) disclosure as a "consumer report," rather than a "file." Similarly, in mandating that "[n]ationwide consumer reporting agencies" make one § 1681g disclosure per year for free, the statute provides that the agency "shall provide [the] *consumer report* . . . not later than 15 days after the date on which the request [was] received." *Id.* § 1681j(a)(2) (emphasis added). We will not countenance a reading of § 1681g(a) that requires consumers to speak with greater heed to the FCRA's technical definitions than the statute's own drafters.

Regulations promulgated under the FCRA concerning CRAs' disclosure obligations likewise use the terms "file" and "report" without drawing a distinction between them. *See, e.g.*, 12 C.F.R. § 1022.138 (defining "[f]ree credit report" as "a file disclosure prepared by or obtained from . . . a nationwide consumer reporting agency"); *id.* § 1022.136 (requiring CRAs to maintain a "centralized source" for "consumers to request annual file disclosures" pursuant to § 1681g that includes, among other things, a statement that the source is intended for the "ordering [of] free annual credit reports as required by Federal law"); *see also* Consumer Fin. Prot. Bureau, CFPB Bulletin 2012-09, at 1 (Nov. 29, 2012) (explaining that the

"[FCRA] requires nationwide specialty consumer reporting agencies . . . to provide, upon request of a consumer, a free annual disclosure of the consumer's file, commonly known as a consumer report.").

RealPage's construction is also at odds with the statutory goals identified by Congress. *See* 15 U.S.C. § 1681(b) (identifying the "purpose of th[e] subchapter" as to require "consumer reporting agencies [to] adopt reasonable procedures," which are "fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of . . . information"). We have explained that those "consumer oriented objectives support a liberal construction of the FCRA" requiring "any interpretation of this remedial statute [to] reflect those objectives." *Cortez*, 617 F.3d at 706 (quotation omitted). Under RealPage's reading, on the other hand, consumers could only access their files pursuant to § 1681g(a) if they are familiar with the esoteric distinction between "files" and "consumer reports" in the Definitions section of the FCRA. Construing Section 1681g(a) in this way would severely limit consumers' "access to . . . information in [their] file" and frustrate their ability to know when they are "being damaged by an adverse credit report," or to "correct[] inaccurate information" in their report. *Id.* (quoting S. Rep. No. 91–517, at 3 (1969)).[15]

_____

[15] For whatever relevance it may carry, § 1681g's history supports the same conclusion. *See Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 142 S. Ct. 941, 948 (2022) (noting that "legislative history" may be "persuasive" regarding Congressional intent). In amending § 1681g(a) to include the phrase, "all information in the *consumer's file*," the

37

In short, when read as a whole, the statute is unambiguous in providing that any generalized "request" by a consumer for the CRA's information about her triggers the CRA's disclose obligation under § 1681g(a).[16] Indeed, despite

Senate Banking, Housing and Urban Affairs Committee made clear that it "intend[ed] this language to ensure that a consumer will receive a copy of *that consumer's report*." S. Rep. No. 104–185 at \*41 (Dec. 14, 1995) (emphasis added). Prior to the amendment, CRAs had often complied with disclosure requests for consumers' *files* by "furnishing consumers with summaries of their *reports*," which the Committee worried did "not provide consumers sufficient access to their *reports*." *Id*. (emphasis added). This suggests that the FCRA's drafters viewed the disclosure of consumers' files as a means of providing them with complete copies of reports that had been requested by third parties, and while they defined the terms separately, they did not draw a conceptual bright line between files and consumer reports requested directly by the consumers. In light of that fact, a CRA should reasonably understand a request for either a report or a file to implicate Section 1681g(a)'s disclosure obligations.

[16] There may be instances when a consumer expressly requests only a particular piece of information in a CRA's possession, and in those circumstances, some courts have found it would be "nonsensical . . . to require a consumer reporting agency to disclose the entire file." *Taylor v. Screening Reports, Inc.*, 294 F.R.D. 680, 686 (N.D. Ga. 2013) (citing *Campos v. ChoicePoint, Inc.*, 237 F.R.D. 478, 484 n.15 (N.D. Ga. 2006). We need not address this scenario in light of Appellants' request that we remand to the District Court to reconsider—with the benefit of our guidance regarding the

the legal arguments it now raises to the contrary, RealPage itself has conformed its conduct to that understanding of the statute. Throughout the Class Period, whether a consumer directly requested her Rental Report or her "file," RealPage disclosed to her the exact same document. J.A. 4, 117–18, 124. Nor did RealPage provide for alternative disclosures for the 16,659 consumers who made direct requests on its website; they were instructed only that a request via the website would yield a "report and any of the disclosures required by the federal Fair Credit Reporting Act." Appellants' Br. 23 (emphasis omitted).[17] Appellee's Br. 46; Reply Br. 17.

---

proper construction of § 1681g(a)—Appellants' motion to redefine the subclass as encompassing only the 16,659 consumers who requested their Rental Reports through RealPage's website. *See* Oral Argument 53:10—54:37. We therefore leave for the District Court to address, if necessary, whether the hypothetical existence of narrower requests for information poses an ascertainability or predominance problem for the proposed class.

[17] The District Court also found that reviewing each individual file to determine whether the file contained public record information (and was therefore missing third-party vendor information) would defeat predominance. J.A. 20. For the reasons we explain below, however, this issue is more properly addressed under our ascertainability rubric. Although "ascertainability problems spill into the predominance inquiry," *Marcus*, 687 F.3d at 594 n.3, they serve distinct purposes. Ascertainability addresses "whether individuals fitting the class definition may be identified without resort to mini-trials," while predominance addresses "whether essential

39

Because the District Court erroneously concluded that individualized proof would be needed to distinguish requests for "reports" from those for "files," it found predominance lacking on that basis. And as that decision rested on "an errant conclusion of law," *Hayes*, 725 F.3d at 354 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 312), we will vacate and remand for the District Court to consider whether Rule 23(b)(3)'s predominance and superiority requirements are satisfied with respect to the subclass.[18]

---

elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence." *Hayes*, 725 F.3d at 359 (citations omitted). As in *Hayes*, the inquiry into the existence *vel non* of public record information in Rental Reports "focus[es] on whether putative class members fit the class definition," and as such we will "analyze[] [this objection] under the ascertainability framework [rather] than the predominance framework." *Id.*

[18] The District Court's interpretation of the statute also informed two other rulings that must be revisited in view of our decision today: Appellants' request for leave to file a renewed motion for class certification, which would have allowed Appellants to redefine the subclass to encompass only consumers who requested their Rental Reports through RealPage's website, *see* J.A. 30, 288–90, and Appellants' motion for reconsideration. The Court denied the latter motion on the ground that Appellants suggested the possibility of "computer-aided administrative" review only in a footnote, while the District Court's individual rules treat substantive arguments raised in footnotes as waived. J.A. 29. We recognize that a district court has the "inherent authority to

### b. Ascertainability

In considering whether to certify a class, a court must perform a two-pronged "rigorous analysis" to determine whether ascertainability and Rule 23(b)(3)'s requirements are satisfied. *In re Hydrogen Peroxide*, 552 F.3d at 309 (citation omitted). In determining whether the ascertainability requirement is satisfied, it must determine that the plaintiff has (1) "defined [the class] with reference to objective criteria," and (2) identified a "reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd*, 784 F.3d at 163 (quoting *Hayes*, 725 F.3d at 355).[19]

---

control its docket," *Knoll v. City of Allentown*, 707 F.3d 406, 409 (3d Cir. 2013), and the promulgation and enforcement of its individual rules falls within this broad power, *see, e.g.*, *Lyda v. CBS Corp.*, 838 F.3d 1331, 1341 (Fed. Cir. 2016). Nonetheless, individual rules should not be interpreted so rigidly as to disregard controlling law simply because a party points it out in a technically incorrect format. Here, Appellants' substantive argument—that the District Court erred in failing to apply our precedent, holding that a class is ascertainable where membership can be determined from the face of the document—was raised in the text of the motion. *See* J.A. 283. That the peripheral point—that computerized assistance may be available to expedite that facial review— was raised in a footnote hardly seems reason to deem the argument waived.

[19] At class certification, plaintiffs must prove ascertainability by a preponderance of the evidence, *Hayes*,

Here, the District Court held that, although Appellants satisfied the first prong by utilizing "objective criteria" to define the Direct Request subclass, they foundered at the second prong because identifying putative class members would require "[a] review of each individual file," which, "of course," was "not administratively feasible." J.A. 15–16. In view of our case law, however, we are hard pressed to understand why that would be so.

Most of the facts relevant to ascertainability are undisputed: RealPage concedes that it has records of the relevant files, J.A. 131–32, 141, 154–55, 285–86; *see* Appellants' Br. 21; Appellees' Br. 49–54, that it produced only Rental Reports to consumers in response to consumers' direct requests, J.A. 4, 117–18, 124, and that it always omitted third-party vendor information from Rental Reports that contained public information during the Class Period, J.A. 126, 131–32. All that remains to ascertain is: (1) which consumers directly requested their files, and (2) of the files directly requested, which contained public record information.

As for the first task, RealPage argues that because the records are kept in separate databases with no "unique identifier" used across both systems, it would be difficult to match its records on requests received via its website with its records on Rental Reports sent out in response to those requests. Appellees' Br. 51. Yet, that matching of records is precisely the sort of exercise we have found sufficiently

725 F.3d at 354, and must establish only that the proposed class members *can* be identified; they need not definitively identify all class members at the certification stage, *Byrd*, 784 F.3d at 163.

42

administrable to satisfy ascertainability in other cases. *See, e.g.*, *Byrd*, 784 F.3d at 169–71 (holding ascertainability satisfied by the prospect of matching addresses from multiple as-of-yet unknown sources); *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 480 (3d Cir. 2020) (holding ascertainability satisfied by the prospect of cross-referencing a defendant's voluminous records with affidavits from putative class members); *City Select Auto Sales Inc. v. BMW of N. Am. Inc.*, 867 F.3d 434, 442 (3d Cir. 2017) (same). And to arguments like RealPage's, *i.e.*, that a unique identifier, such as a customer number or social security number, is required to render a simple matching exercise administrable, we have responded that "where [a defendant's] lack of records makes it more difficult to ascertain members of an otherwise objectively verifiable class, the [individuals] who make up that class should not bear the cost of the [defendant's] faulty record keeping." *Hargrove*, 974 F.3d at 470. That is also our answer today: we will not allow defendants to defeat ascertainability with a strategic decision to house records across multiple sources or databases.[20]

---

[20] To the extent the Direct Requests subclass as currently defined includes putative class members who obtained their reports by directly calling or writing to RealPage, Appellants would also need to establish an administrable way to identify those consumers who directly requested a copy of their file but who did not do so using the form on RealPage's website. However, RealPage represents that it lacks the records to determine which consumers received their reports in response to written or telephonic requests. On remand, we leave to Appellants whether they wish to propose an alternative subclass definition, and to the District Court to

But what of the second task? Is it administrable to identify which files contain public record information where that is clear from the face of each file but would require a file-by-file review? The District Court apparently took from our precedent a *per se* rule that "[a] review of each individual file is . . . not administratively feasible." J.A. 16. But that is not the case, so we take this opportunity to clarify what our case law requires.

We first adopted the ascertainability requirement in *Marcus v. BMW of North America, LLC*, where we held a class is not ascertainable where "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials.'" 687 F.3d at 593. And in *Marcus* and our next two ascertainability cases, *Hayes v. Wal-Mart Stores, Inc.* and *Carrera v. Bayer Corp.*, we explained that putative classes are not ascertainable where either a defendant's records do not contain the information needed to ascertain the class or the records do not exist at all, leading to the "mini-trials" that we disapproved of in *Marcus*. *See Hayes*, 725 F.3d at 355; *Carrera v. Bayer Corp.*, 727 F.3d 300, 307–08 (3d Cir. 2013). But, as we qualified in *Byrd v. Aaron's Inc.*, ascertainability does not mean that "*no* level of inquiry as to the identity of class members can ever be undertaken," because that would make Rule 23(b)(3) class certification all but impossible. 784 F.3d at 171 (emphasis in original). We also cautioned that "the size of a potential class and the need to review individual files to identify its members are not reasons to deny class

determine, in view of this opinion, whether any putative subclass as amended is ascertainable.

44

certification." *Id.* (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539–40 (6th Cir. 2012)).

We confirmed these parameters in *Hargrove v. Sleepy's LLC*, where we held that affidavits in combination with "thousands of pages of contracts, driver rosters, security gate logs, and pay statements" sufficed to ascertain a class of full-time drivers for Sleepy's, despite gaps in the records and the work required to synthesize "several distinct data sets." 974 F.3d at 470, 480. Similarly, in *City Select Auto Sales Inc. v. BMW of North America* we held that "[a]ffidavits, in combination with records or other reliable and administratively feasible means," could satisfy our ascertainability standard, 867 F.3d at 441, remanding to determine whether there were any gaps in a database not produced below that could make identifying putative class members unadministrable, *id.* at 442 & n.5.

Together, *Byrd*, *Hargrove*, and *City Select* instruct that a straightforward "yes-or-no" review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources. And that is precisely what we have here. Verifying whether there is public record information in the file requires only an examination of the face of Rental Reports that are indisputably in RealPage's possession, J.A. 131–32, 141, 154–55, 285–86, and does not require the sort of mini-trial or individualized fact finding at issue in *Marcus*, *Hayes*, and *Carrera*. Indeed, the review required here is even more straightforward than in *Byrd, Hargrove*, and *City Select*, as Appellants have already identified the records they require, demonstrated they are in

45

RealPage's possession, and explained how those records can be used to verify putative subclass members.[21]

To the extent RealPage's objection is to the number of records that must be individually reviewed, that is essentially an objection to the size of the class, which we stated explicitly in *Byrd* is not a reason to deny class certification. 784 F.3d at 171. To hold otherwise would be to categorically preclude class actions where defendants purportedly harmed too many people, which would "seriously undermine the purpose" of a class action to "vindicate meritorious individual claims in an

---

[21] While there is no conveniently marked subsection of a Rental Report entitled "public records," that does not render the class unascertainable. A review of the face of each file would still answer the binary question of whether the file contains public records, and the categories of information that qualify as "public records" are readily identifiable. The appellate record does not specify which types of public records appear in Rental Reports. The FCRA identifies several types of public records that are subject to certain accuracy requirements: "record[s] . . . that relate[] to an arrest, indictment, conviction, civil judicial action,"—which we understand to include records from the civil eviction actions, like the filing contained in Bey's file—"tax lien, or outstanding judgment," 15 U.S.C. § 1681d(d)(3); *see also id.* § 1681k(a)(2) ("record[s] relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments"), and so we limit our ascertainability analysis to considering whether these classes of public records are present. We take no position on whether the identification of other kinds of public records in a consumer's file could, in some other case, pose an ascertainability problem.

efficient manner." *Id.* So long as the review is for information apparent on the face of the document, the number of files does not preclude ascertainability. *See id.* at 170 ("There will always be some level of inquiry required to verify that a person is a member of a class . . . . Such a process of identification does not require a 'mini-trial,' nor does it amount to 'individualized fact-finding[.]'" (quoting *Carrera*, 727 F.3d at 307)).

In sum, the District Court misapprehended our case law and therefore erred in denying certification of the Direct Requests subclass on the basis of ascertainability, as well as predominance.

## IV. CONCLUSION

For the foregoing reasons, we will vacate the District Court's order denying class certification of the Direct Requests subclass and remand for the Court's reconsideration in light of this opinion.