**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-2119

MICHAEL T. DREHER,

Plaintiff - Appellee,

v.

EXPERIAN INFORMATION SOLUTIONS, INC.,

Defendant – Appellant,

and

EQUIFAX, INC.; TRANS UNION, LLC; EQUIFAX INFORMATION SERVICES, LLC; CARDWORKS, INC.; CARDWORKS SERVICING, LLC,

Defendants.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  John A. Gibney, Jr., District Judge.  (3:11-cv-00624-JAG)

Argued:  March 21, 2017                          Decided:  May 11, 2017

Before KING, SHEDD, and THACKER, Circuit Judges.

Vacated and remanded by published opinion.  Judge Thacker wrote the opinion, in which Judge King and Judge Shedd joined.

**ARGUED**: Meir Feder, JONES DAY, New York, New York, for Appellant. Deepak Gupta, GUPTA WESSLER PLLC, Washington, D.C., for Appellee. **ON BRIEF**: Daniel J. McLoon, JONES DAY, Los Angeles, California, for Appellant. Jonathan E. Taylor, Richard J. Rubin, GUPTA WESSLER PLLC, Washington, D.C.; Leonard A. Bennett, Matthew J. Erausquin, Susan M. Rotkis, CONSUMER LITIGATION ASSOCIATES, P.C., Newport News, Virginia; Kristi Cahoon Kelly, Andrew Guzzo, KELLY & CRANDALL, PLC, Fairfax, Virginia, for Appellee.

---

THACKER, Circuit Judge:

This appeal is from a $11,747,510 judgment in an approximately 69,000 member class action. We consider whether the decision of Experian Information Solutions, Inc. ("Experian") to list a defunct credit card company, rather than the name of its servicer, as a "source[] of . . . information" on an individual's credit report -- without more -- creates sufficient injury in fact under the Fair Credit Reporting Act ("FCRA") for purposes of Article III standing. 15 U.S.C. § 1681g(a)(2).

We conclude that where an individual fails to allege a concrete injury stemming from allegedly incomplete or incorrect information listed on a credit report, he or she cannot satisfy the threshold requirements of constitutional standing. Here, we discern no concrete injury on behalf of the named plaintiff. Therefore, we vacate and remand with instructions that the case be dismissed.

I.

A.

In 2010, Michael Dreher was undergoing a background check for a security clearance when the federal government discovered he was associated with a delinquent credit card account. Dreher's cousin had taken out the credit card in Dreher's name to cover expenses for a failing bowling alley.[1] To clear up the matter, Dreher requested credit reports from three credit agencies, including Experian. Dreher received a series of Experian credit reports, which listed a delinquent account under the names "Advanta

_____

[1] The parties dispute whether Dreher knew about the card.

3

Bank" or "Advanta Credit Cards" (collectively, "Advanta") and provided Pennsylvania and New York P.O. Box addresses. J.A. 160, 168.[2]

Thereafter, in early 2011, Dreher sent letters to Advanta. First, in March 2011, he "requested some verification that [he] owed this debt," and receiving no response, he sent another letter on April 15, 2011, which was similar in content. J.A. 155. Dreher then received a response on Advanta letterhead dated April 18, 2011, with a March 2011 statement showing an outstanding balance of $15,746.94, along with the online credit card application bearing Dreher's name and social security number. On May 23, 2011, Dreher sent a follow-up correspondence "instructing [Advanta] to delete the inaccurate information from [his] credit files." *Id.* Again receiving no response, he "lost hope that Advanta . . . would fix their mistake." *Id.* He contacted Experian directly about the issue, but still his credit report listed the delinquent Advanta account. According to Dreher, this process caused "additional stress and wasted hours of [his] time." *Id.* at 156. It did not, however, affect his security clearance; in fact, based on Dreher's representation that he was paying down the balance, the government approved his clearance, which took a total of eight days to process. The Advanta account was finally "deleted from Dreher's credit file" on June 6, 2012. Stipulation at 3, *Dreher v. Experian Infos. Sols.*, No. 3:11-cv-624 (E.D. Va. filed Nov. 6, 2015), ECF No. 411.

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal. A June 21, 2011 credit report also contained a phone number. *See* J.A. 168. It is unclear whether Dreher attempted to call this number.

B.

Unbeknownst to Dreher, in early 2010, the Utah Department of Financial Institutions had closed Advanta, which had failed to withstand the 2008 financial crisis, and named the Federal Deposit Insurance Corporation ("FDIC") as receiver. Deutsche Bank Trust Company ("Deutsche Bank") received a security interest in Advanta receivables and appointed CardWorks, Inc., and CardWorks Servicing LLC (collectively, "CardWorks") as servicer of Advanta's portfolio, effective August 1, 2010. This meant that CardWorks would "respond[] to credit card customer complaints and effect[] compromises and settlements of ongoing credit card customer disputes." J.A. 346. In its capacity as Advanta's servicer, CardWorks decided to do business using the Advanta name, the phone number Advanta used prior to August 2010, and the Advanta website, with the goal of "mak[ing] the servicing transfer seem as innocuous as possible." *Id.*

CardWorks then had to decide how to list Advanta accounts, or tradelines,[3] on consumer credit reports. On October 4, 2010, Tom Wineland, a post-closing asset manager for the FDIC, signed a letter to Experian agreeing that the tradeline appearing for all Advanta accounts on Experian credit reports should bear the Advanta name. Authorized representatives from CardWorks and the former Advanta Bank also signed the letter. Wineland explained that he agreed to using the Advanta moniker because the

---

[3] A tradeline is an account entry on a credit report and, in addition to the name and address of the creditor, typically includes information like the "account type, opening date of account, credit limit, account status, and payment history." *Trans Union Corp. v. Fed. Trade Comm'n*, 245 F.3d 809, 812 (D.C. Cir. 2001).

successor creditor of the Advanta accounts, Deutsche Bank, remained the same after Advanta was placed in receivership; in addition, "Advanta Credit Cards" "was the name least confusing to cardholders who (a) might not recognize the new servicer of their credit accounts represented in the tradelines, and (b) . . . would continue to access their accounts and make payments at the [Advanta] website." J.A. 344. Using the name of the initial creditor also comported with Experian's "common practice to utilize an associated subscriber name that will assist consumers to recognize the accounts and enable consumers to correct any inaccuracies or lodge disputes if necessary." *Id.* at 354.

### C.

On September 21, 2011, Dreher individually sued Experian and CardWorks in the Eastern District of Virginia.[4] He later amended his complaint to assert three class claims and seven individual claims on the basis that, inter alia, Experian willfully violated the FCRA by failing to include the name "CardWorks" in the Advanta tradelines on its credit reports. On October 5, 2012, Experian moved for partial summary judgment on Dreher's class claims, arguing that Dreher did not produce evidence of willfulness as required under the FCRA. On May 30, 2013, the district court denied the motion. It later certified the class to include

---

[4] Dreher resolved all claims against CardWorks, and it was dismissed as a defendant on November 1, 2012.

[a]ll natural persons who: (1) requested a copy of their consumer disclosure from Experian on or after August 1, 2010; (2) received a document in response that identified "Advanta Bank" or "Advanta Credit Cards" as the only source of the information for the tradeline; (3) and whose "date of status" or "last reported" field reflected a date of August 2010 or later.

J.A. 327. On July 3, 2014, Experian filed a petition for permission to bring an interlocutory appeal on the certification issue, which this court denied. *See* Order, *Experian Info. Sols.*, No. 14-325 (4th Cir. filed Sept. 2, 2014), ECF No. 16.

The parties then filed cross-motions for partial summary judgment on October 31, 2014, wherein Experian argued that Dreher and the class members lacked Article III standing, and Dreher argued Experian willfully violated the FCRA. The district court granted Dreher's motion, concluding as a matter of law that "Experian committed a willful violation of the [FCRA]," J.A. 407, because "[n]o jury could find Experian's intentional omission of CardWorks was objectively reasonable," *id.* at 404. In turn, it denied Experian's motion, reasoning that the FCRA "creates a statutory right to receive the 'sources of information' for one's credit report," and when a credit reporting agency fails to disclose those sources, "it violates that right, thus creating a sufficient injury-in-fact for constitutional standing." *Id.* at 390. The district court did not analyze whether the injury was specific and concrete. Instead, it concluded that *any* violation of the statute sufficed to create an Article III injury in fact. However, the district court also recognized "this Order involves a controlling question of law as to which there is substantial ground for difference of opinion [and] an immediate appeal . . . would materially advance the ultimate termination of the litigation." *Id.* at 407-08. Experian

7

again attempted to lodge an interlocutory appeal with this court, to no avail. *See* Order, *Experian Info. Sols. v. Dreher*, No. 14-491 (4th Cir. filed Jan. 29, 2015), ECF No. 22.

In February 2015, the district court severed the class claim[5] from the individual claims for separate jury trials. Rather than hold a jury trial on statutory and punitive damages on the class claim (Dreher did not seek actual damages), the parties stipulated to an award of $170 in statutory damages for each class member and no punitive damages. On August 26, 2015, the district court entered final judgment on behalf of Dreher and the class in the amount of $170 per class member, totaling over $11.7 million.[6] Experian timely noted this appeal, and we held the case in abeyance pending the United States Supreme Court's decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), which was decided in May of 2016.

## II.

We review a district court's grant of summary judgment de novo. "In doing so, we apply the same legal standards as the district court, and view all facts in the light most favorable to the nonmoving party." *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017) (internal quotation marks omitted). We

---

[5] By this time, Dreher had dropped two of his class claims, leaving only one.

[6] The district court entered judgment on Dreher's individual claims on November 12, 2015, after Experian made -- and Dreher accepted -- an offer of judgment of $65,000 pursuant to Federal Rule of Civil Procedure 68. Experian does not challenge any ruling with respect to the individual claims in this appeal.

likewise review legal questions regarding standing de novo. *See David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013).

III.

The standing requirement stems from Article III, section 2 of the United States Constitution, which provides that the "judicial Power shall extend to all Cases [and] Controversies." U.S. Const. art. III, § 2, cl. 1. Indeed, "no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (alteration omitted) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The law of standing "serves to prevent the judicial process from being used to usurp the powers of the political branches, and confines the federal courts to a properly judicial role." *Id.* (alterations, citations, and internal quotation marks omitted). Standing "is a threshold jurisdictional question" that ensures a suit is "appropriate for the exercise of the [federal] courts' judicial powers." *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)).

In a class action matter, "we analyze standing based on the allegations of personal injury made by the named plaintiff[]. 'Without a sufficient allegation of harm to the named plaintiff in particular, [he] cannot meet [his] burden of establishing standing.'" *Beck v. McDonald*, 848 F.3d 262, 269–70 (4th Cir. 2017) (citation omitted) (quoting *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011)); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)). In

order to determine whether Dreher, the named plaintiff here, has standing -- that is, whether he meets the "irreducible constitutional minimum" of a "case" or "controversy" -- we employ a familiar three-part test. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Dreher "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan*, 504 U.S. at 560–61). The burden of establishing these elements falls on the party invoking federal jurisdiction, and all three elements are necessary prerequisites to establish standing. *See id.* Here, Appellant stumbles on the first of these requirements: injury in fact.

A.

To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). In *Spokeo*, the Supreme Court discussed the dual requirements of particularization *and* concreteness. There, the plaintiff, Thomas Robins, sued Spokeo, Inc. ("Spokeo"), a company that operates an online "people search engine," for alleged violations of the FCRA. *Id*. at 1544. Robins alleged that Spokeo collected incorrect information about him and disseminated it on its website. The district court dismissed the complaint for lack of standing, and the Ninth Circuit reversed, reinstating the claim. *See id.*

The Supreme Court vacated the Ninth Circuit's decision because that court "failed to fully appreciate the distinction between concreteness and particularization." *Spokeo*, 136 S. Ct. at 1550. The Court found that in analyzing the "particular and concrete"

10

aspect of the standing requirement, the Ninth Circuit "elided" the "independent requirement" of concreteness. *Id*. at 1548. Rather, the Ninth Circuit decided Robins alleged a concrete injury for two reasons that bear on particularization: (1) he alleged that Spokeo "violated *his* statutory rights, not just the statutory rights of other people"; and (2) his "personal interests in the handling of his credit information are *individualized rather than collective*." *Id*. (internal quotation marks omitted) (emphases in original). Therefore, the Court remanded for a proper consideration of the concreteness inquiry. *See id*. at 1550.

Although the Court declined to decide whether Robins's complaint alleged a sufficiently concrete injury, it did give direction upon remand, explaining that concreteness "is quite different from particularization." *Spokeo*, 136 S. Ct. at 1548. A concrete injury is "de facto," meaning that "it must actually exist" and is "real, and not abstract." *Id*. (internal quotation marks omitted). Concreteness, however, "is not . . . necessarily synonymous with 'tangible.'" *Id*. at 1549. "Although tangible injuries are perhaps easier to recognize, . . . intangible injuries can nevertheless be concrete." *Id*. (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (free speech); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (free exercise)). In order to decide whether an intangible harm constitutes an injury in fact, "history and the judgment of Congress play important roles." *Id.* However, a plaintiff cannot automatically satisfy the injury in fact requirement just because "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* One cannot "allege a

11

bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement." *Id.*

As an example, discussing the FCRA specifically, the *Spokeo* Court explained "[a] violation of one of the FCRA's procedural requirements may result in no harm":

> [E]ven if a consumer reporting agency fails to provide the required notice to a user of the agency's consumer information, that information regardless may be entirely accurate. In addition, not all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code. It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm.

*Id.* at 1550 (footnote omitted). Thus, the Court noted that a technical violation of the FCRA may not rise to the level of an injury in fact for constitutional purposes.

## B.

We now turn to the standing argument in this appeal. The FCRA provision at issue states that a consumer reporting agency ("CRA")[7] "shall, upon request . . . clearly and accurately disclose to the consumer . . . *[t]he sources of the information* [in the consumer's file at the time of the request]." 15 U.S.C. § 1681g(a)(2) (emphasis supplied). Dreher alleged that Experian violated this provision because it "fail[ed] to clearly and accurately disclose the *source* of the Advanta Bank tradeline reporting," which he claims is CardWorks. J.A. 49 (emphasis supplied). Thus, Dreher claims he suffered a cognizable "informational injury" because he was denied "specific information

---

[7] The parties do not dispute Experian's status as a consumer reporting agency. *See* 15 U.S.C. § 1681a(f).

12

to which [he] w[as] entitled under the FCRA." Appellees' Br. 16–17 (internal quotation marks omitted). Even assuming *arguendo* CardWorks was a "source" as contemplated by § 1681g(a)(2) and, therefore, a statutory violation occurred particularized to Dreher, his complaint nonetheless fails to demonstrate a concrete injury.

1.

An "informational injury" is a type of intangible injury that can constitute an Article III injury in fact. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998); *see also Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989). However, a statutory violation *alone* does not create a concrete informational injury sufficient to support standing. *See Spokeo*, 136 S. Ct. at 1549. Rather, a constitutionally cognizable informational injury requires that a person lack access to information to which he is legally entitled *and* that the denial of that information creates a "real" harm with an adverse effect. *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted); *see also Akins*, 524 U.S. at 21 ("The 'injury in fact' that respondents have suffered consists of their inability to obtain information . . . that . . . [a] statute requires [to be] ma[d]e public" where that information "would help them . . . evaluate candidates for public office.").

To determine whether a party has suffered such a harm, courts look to a variety of sources, including whether injuries are of the type that have "traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549. Dreher does not propose a common law analogue for his alleged FCRA injury, and we find no traditional right of action that is comparable. The lack of a common law analogue is not fatal to his case, *see Pub. Citizen*, 491 U.S. at 449 (finding a "sufficiently

13

discrete injury" without finding that a similar right existed at common law), but it also does not help him establish a concrete injury, *cf. Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 774 (2000) (in concluding the government suffered an injury in a qui tam suit, looking to the "long tradition of [such] actions in England and the American Colonies" as being constitutionally "amenable to . . . the judicial process" (internal quotation marks omitted)).

*Spokeo* also states, "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Spokeo*, 136 S. Ct. at 1549. Therefore, "its judgment is . . . instructive and important." *Id.* Our sister circuit has recently reasoned that a plaintiff suffers a concrete informational injury where he is denied access to information required to be disclosed by statute, *and* he "suffers, by being denied access to that information, the type of harm *Congress sought to prevent* by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (emphasis supplied). We find this reasoning persuasive. To be sure, it would be an end-run around the qualifications for constitutional standing if any nebulous frustration resulting from a statutory violation would suffice as an informational injury.

In enacting the FCRA, Congress sought "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). But Dreher has failed to show how the knowledge that he was corresponding with a CardWorks employee, rather than an Advanta employee, would have made any difference at all in the "fair[ness] or accura[cy]" of his credit report, or that it would have made the credit resolution process

14

more efficient. *Id.*; *see also* 15 U.S.C. § 1681(a)(1). He claims there is a value in "knowing who it is you're dealing with," and if a company can "hide who [they] are, [they]'re not concerned about consumer goodwill." Oral Argument at 24:41-24:48, *Dreher v. Experian Info. Sols.*, No. 15-2119 (4th Cir. argued March 21, 2017), available at http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments. But these arguments are chiefly customer service complaints, as the district court itself recognized. *See* J.A. 331 n.6 ("[W]hen a consumer called Advanta with a question about her bill, she actually spoke to someone from Cardworks without even knowing the person on the phone was not with Advanta. In practical outcome, it is no different from any consumer calling her bank."). Thus, the harm Dreher alleges he suffered is not the type of harm Congress sought to prevent when it enacted the FCRA.

2.

Failing to identify either a common law analogue or a harm Congress sought to prevent, Dreher is left with a statutory violation divorced from any real world effect. As *Spokeo* demonstrated, a statutory violation absent a concrete and adverse effect does not confer standing. In fact, this case is markedly similar to the *Spokeo* examples. *See* 136 S. Ct. at 1550. Like the user notice example, Dreher has not shown that dealing with representatives working for CardWorks rather than Advanta slowed down the process of obtaining a more accurate credit report. Writing to the P.O. Box addresses was an accurate way to lodge consumer inquiries about Advanta accounts, and Dreher has not shown that he was prevented in any way from reaching customer service representatives to discuss his report. And like the zip code example, Experian's listing of Advanta

15

instead of CardWorks had no practical effect on Dreher's receipt of the information he needed to clear the report of the Advanta account. Moreover, to the extent Dreher claims the delinquent Advanta account "threatened his security clearance," Appellee's Br. 1, in actuality, the account had no legitimate effect on the background check process. Thus, receiving a creditor's name rather than a servicer's name -- without hindering the accuracy of the report or efficiency of the credit report resolution process -- worked no real world harm on Dreher.

Moreover, the cases on which Dreher relies are inapposite because both cases involved the deprivation of information that adversely affected the plaintiffs' conduct. In *Public Citizen v. U.S. Department of Justice*, the Department of Justice denied non-profit groups Public Citizen and the Washington Legal Foundation names of candidates for federal judicial appointment under consideration by the American Bar Association ("ABA")'s standing committee on the federal judiciary, as well as access to ABA meetings and records regarding the same. *See* 491 U.S. at 447–48. The Supreme Court concluded the non-profits had suffered a concrete injury for standing purposes because providing the groups the information would have allowed them to "participate more effectively in the judicial selection process." *Id.* at 449. Dreher also relies on *Federal Election Commission v. Akins*, wherein a group of voters sought to challenge the Federal Election Commission's decision that the American Israeli Public Affairs Committee was not a "political committee" and therefore did not have to disclose its membership, contributions, or expenditures. 524 U.S. at 13–14. The Supreme Court held that the voters had alleged a concrete injury because the information they sought "would help

16

them . . . to evaluate candidates for public office." *Id*. at 21. Thus, the Court focused on the type of concrete harm Congress intended to protect in the Federal Election Campaign Act -- deprivation of information about candidates for public office -- which is "directly related to voting, the most basic of political rights." *Id*. at 24–25.

Here, however, Dreher has failed to demonstrate how viewing the name "Advanta" rather than "CardWorks" adversely affected his conduct in any way. He was still able to receive a fair and accurate credit report, obtain the information he needed to cure his credit issues, and ultimately resolve those issues. If anything, the record shows that listing the Advanta name may actually *assist* an alleged identity theft victim like Dreher. A seasoned former associate director of the Federal Trade Commission, Joel Winston, stated:

> [I]n cases of identity theft . . . the name of the creditor is likely to be more useful than the name of the servicer. While the consumer may not recognize either as a company with which it has done business, the name of the creditor in many cases is likely to be at least generally familiar, making it easier for the consumer to ascertain whether s/he has an account with that creditor. The name of the servicer, on the other hand, is unlikely to be recognizable at all.

J.A. 362–63. Winston also stated, "In my experience, it is common for CRAs to identify the creditor as the source of the information, rather than the servicer, because this designation is likely to be more useful to consumers." *Id*. at 366.

17

Therefore, we readily hold that Dreher was not adversely affected by the alleged error on his credit report. He suffered no real harm, let alone the harm Congress sought to prevent in enacting the FCRA.

C.

Because Dreher has failed to demonstrate he has suffered a concrete injury sufficient to satisfy Article III standing, the district court's judgment is vacated, and this class action must be dismissed on jurisdictional grounds. We do not address the district court's decision on the merits. After all, "[w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co.*, 523 U.S. at 94 (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).

IV.

For the foregoing reasons, we vacate the district court's judgment and remand with instructions to dismiss this case.

*VACATED AND REMANDED*

18