**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-1684**

———————

LYNN FREEMAN, on behalf of herself and all others similarly situated,

Plaintiff - Appellee,

v.

PROGRESSIVE DIRECT INSURANCE COMPANY,

Defendant - Appellant.

———————

Appeal from the United States District Court for the District of South Carolina, at Aiken. Donald C. Coggins, Jr., District Judge.  (1:21-cv-03798-DCC)

———————

Argued:  May 8, 2025                          Decided:  August 25, 2025

———————

Before WILKINSON, NIEMEYER, and BERNER, Circuit Judges.

———————

Class certification order reversed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Wilkinson joined.  Judge Berner wrote a dissenting opinion.

———————

**ARGUED:**  Jeffrey Cashdan, KING & SPALDING LLP, Atlanta, Georgia, for Appellant. Jacob Lawrence Phillips, JACOBSON PHILLIPS PLLC, Winter Park, Florida, for Appellee.  **ON BRIEF:**  Paul Alessio Mezzina, Amy R. Upshaw, Christine M. Carletta, Washington, D.C., Julia C. Barrett, Austin, Texas, Nicole Bronnimann, Houston, Texas, Zachary A. McEntyre, James Matthew Brigman, Allison Hill White, Erin Munger, KING & SPALDING LLP, Atlanta, Georgia, for Appellant.

NIEMEYER, Circuit Judge:

Lynn Freeman commenced this action against Progressive Direct Insurance Company, alleging that Progressive breached the insurance policy it had issued to her by paying her "less than the actual cash value" of her vehicle, which had been declared a total loss following a collision. She claimed that Progressive improperly reduced its appraisal of her vehicle's value by applying a "Projected Sold Adjustment," which was based on the *predicted* sales prices of vehicles like hers and applied when actual sales prices were unavailable.

Freeman purported to represent a class of all persons in South Carolina who were similarly situated insofar as Progressive decreased their compensation for their totaled vehicles by applying Projected Sold Adjustments. The district court certified the class, and Progressive sought interlocutory review of the district court's order under Federal Rule of Civil Procedure 23(f).

We granted Progressive permission to appeal and now reverse the district court's order. We conclude (1) that Freeman has not alleged a breach of contract by which she was harmed and therefore lacks standing such that her claim is typical of the class and (2) that, in any event, she has not satisfied Rule 23's requirements of commonality and predominance because determining whether Progressive breached its obligation to provide actual cash value to each class member requires individualized inquiries, precluding a class-wide treatment of their breach of contract claims.

2

I

When Lynn Freeman's 2020 Chevrolet Equinox was rendered a total loss after a collision on May 11, 2021, she sought payment of its market value from her insurance company, Progressive. Her policy provided that Progressive would pay "the actual cash value of [her vehicle] at the time of the loss reduced by the applicable deductible," which was $2,000. And it specified that "[t]he actual cash value [would be] determined by the market value, age, and condition of the vehicle at the time the loss occurs." Implicitly recognizing that various criteria could be considered in determining actual cash value and therefore that Progressive and the insured could disagree on a vehicle's valuation, the policy provided:

> If we cannot agree with you on the amount of a loss, then we or you may demand an appraisal of the loss. Within 30 days of any demand for an appraisal, each party shall appoint a competent appraiser and shall notify the other party of that appraiser's identity. The appraisers will determine the amount of loss. If they fail to agree, the disagreement will be submitted to a qualified umpire chosen by the appraisers. If the two appraisers are unable to agree upon an umpire within 15 days, we or you may request that a judge of a court of record, in the county where you reside, select an umpire. The appraisers and umpire will determine the amount of loss. The amount of loss agreed to by both appraisers, or by one appraiser and the umpire, will be binding.

The policy did not quantify the actual payment that Progressive was obliged to pay with respect to a loss — nor could it, as losses would inevitably vary according to the "market value, age, and condition of the vehicle." But the policy alerted Freeman that Progressive's calculation of what it would offer as the actual cash value of a totaled vehicle might be informed by various internal and external systems. In a paragraph labeled "Settlement of Claims," the policy provided:

3

> We may use estimating, appraisal, or injury evaluation systems to assist us in adjusting claims under this policy and to assist us in determining the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by us or a third party and may include computer software, databases, and specialized technology.

To arrive at its position as to the actual cash value of Freeman's vehicle, Progressive used a valuation system designed by Mitchell International, Inc., that identifies comparable vehicles recently sold or listed for sale in the insured's area. The Mitchell software adjusts the prices of the comparators to reflect differences in mileage and equipment. If the software identifies a "sold" price for a comparable vehicle, or if the vehicle is listed at a "no haggle" dealership, no further adjustments are made. If, however, there is no sold price for a comparable vehicle, the software identifies vehicles listed for sale at dealerships that negotiate as to price and then applies a "Projected Sold Adjustment" — derived from comparison of list prices and sold prices — to "reflect consumer purchasing behavior (negotiating a different price than the listed price)."

The adjusted values of comparable vehicles are then averaged to yield a base value for the insured's totaled vehicle, which may then be adjusted further to account for unique aspects of the insured's totaled vehicle, such as its pre-loss condition and any aftermarket parts.

In this case, the Mitchell software identified three listings of comparable 2020 Chevrolet Equinoxes: (1) one listed for $20,865 with 15,084 miles on it; (2) another listed for $21,490 with 18,261 miles; and (3) a third listed for $23,887 with 11,899 miles. These list prices were adjusted for differences in mileage and equipment, and a Projected Sold Adjustment was applied to each. The average of those adjusted prices was $20,531.63,

4

representing the base value of Freeman's vehicle. Because an inspection of Freeman's vehicle revealed that no condition adjustments were necessary, Progressive offered that value to Freeman as the market value of her vehicle.

Freeman still owed approximately $30,000 on her purchase loan and was thus "underwater," although her underwater condition was covered by loan payoff insurance. As a result, she would not have improved her financial position by demanding a greater actual cash value from Progressive. Regardless of the actual cash value Progressive offered, she would have had to bear only the $2,000 deductible amount required by her policy. Given these circumstances, Freeman did not reject Progressive's offer, negotiate her vehicle's value, or invoke the third-party appraisal process afforded by the policy. Instead, she agreed to the offer made by Progressive and paid the $2,000 deductible, which she would have had to pay in any event.

Nonetheless, Freeman commenced this action against Progressive, alleging that it breached her insurance contract by paying her "less than the actual cash value required by Progressive's insurance contracts" because it applied the Projected Sold Adjustment in determining its offer to her. She also purported to represent a class of South Carolina residents whose losses were allegedly undervalued because of the application of Projected Sold Adjustments. She defined the purported class as follows:

> All persons insured by a contract of automobile insurance issued by Progressive to a South Carolina resident, and who, from the earliest allowable time through the date of resolution of this action, received a first-party total loss valuation and payment that included a downward adjustment premised on a "Projected Sold Adjustment" or similar adjustment.

5

In response to Freeman's motion for class certification, Progressive argued that Freeman lacked standing because she was not injured by any breach of contract; that there was no evidence that using the Projected Sold Adjustment resulted in an inaccurate market value; and that common questions did not predominate. It argued that the court would have to determine individually whether the application of the Projected Sold Adjustment caused Progressive to pay each class member less than the actual cash value of that member's vehicle. In short, according to Progressive, each of the breach of contract claims had to be determined on an individual basis, thereby precluding class treatment.

By order dated May 8, 2024, the district court rejected Progressive's arguments and certified a class defined as follows:

> All persons who made a first-party claim on a policy of insurance issued by Progressive Direct Insurance Company to a South Carolina resident who, from October 15, 2018 through the date an order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on an Instant Report prepared by Mitchell (i.e. Report Code= "COMP") and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value.

Progressive then sought permission under Rule 23(f) to file an interlocutory appeal from the district court's order, and by order dated July 24, 2024, we granted that permission.

II

Class actions are an exception to the usual rule that cases be conducted "by and on behalf of the individual named parties only." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982)). And

6

to represent absent class members, a plaintiff must carry the burden of showing that the proposed class action satisfies the four prerequisites of Rule 23(a), including, as relevant here, that "there are questions of law or fact common to the class" and that the plaintiff's claims are "typical of the claims" of the absent class members sought to be represented. Fed. R. Civ. P. 23(a)(2), (3); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004) ("The plaintiffs who propose to represent the class bear the burden of demonstrating that the requirements of Rule 23 are satisfied"); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014) (same). In addition, the plaintiff must also demonstrate that "the proposed class fits into one of the specific forms of class adjudication provided by Rule 23(b)," in this case Rule 23(b)(3). *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019). Rule 23(b)(3) requires the plaintiff to show, among other things, "that the questions of law or fact common to class members *predominate* over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3) (emphasis added).

To show that issues are common, as required by Rule 23(a)(2), the plaintiff must demonstrate that "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (alteration in original) (quoting 2 William B. Rubenstein, *Newberg on Class Actions* § 4:50 (5th ed. 2012)). Individual issues, conversely, are those where "members of a proposed class will need to present evidence that varies from member to member." *Id.* (quoting Rubenstein, *supra,* § 4:50).

And to show that the common issues predominate, as required by Rule 23(b)(3), the plaintiff must demonstrate that the questions of law or fact common to class members

7

"predominate over any questions affecting only individual members," *i.e.*, that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues," *Tyson Foods*, 577 U.S. at 453 (quoting Rubenstein, *supra,* § 4:49). Thus, Rule 23(b)(3)'s predominance requirement is "far more demanding" than Rule 23(a)(2)'s commonality requirement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). Indeed, the commonality requirement is "subsumed under, or superseded by," the predominance requirement. *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting *Amchem*, 521 U.S. at 609).

With respect to all requirements for class certification, we examine whether the certifying court took a "close look at relevant matters," conducted a "rigorous analysis of such matters," and made "findings that the requirements of Rule 23 have been satisfied." *Gariety*, 368 F.3d at 365 (cleaned up). Moreover, it is well established that "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, the plaintiff "must affirmatively demonstrate" her compliance with Rule 23 with "evidentiary proof." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (first quoting *Wal-Mart*, 564 U.S. at 350; and then quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).

III

Progressive contends first that Freeman lacks standing to challenge its use of Projected Sold Adjustments because she has failed to show, given her particular

8

circumstances, that Progressive's use of such adjustments caused her to suffer an injury. We agree.

To determine the actual cash value of Freeman's loss, Progressive used three listings of comparable vehicles with significantly lower mileage, in the amounts of $20,865, $21,490, and $23,887, and offered her $20,531.63 as the market value of her vehicle. Freeman did not object to or reject Progressive's offer but instead accepted it. This was understandable because her only obligation — in light of her gap insurance — was to pay the $2,000 deductible. The entire payment from Progressive would go toward paying off a portion of her purchase loan, and her gap insurance would cover the remaining portion. Of course, had Freeman believed that Progressive's offer was inadequate, she still could have attempted to negotiate a higher value or engaged in the appraisal process set forth in the policy. But she did neither, and she cannot now demonstrate personal harm. *See Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 116 (4th Cir. 2021). Moreover, even after she commenced this litigation, she has not attempted to show that her vehicle had a greater value than the amount that Progressive offered and paid. In these circumstances, we fail to see how Freeman has plausibly alleged a breach of her insurance policy. But more importantly, even were we to accept Freeman's theory of breach, she has failed to show how she suffered any injury.

"Article III standing [is] a necessary threshold issue" when reviewing a class-certification order under Rule 23(f). *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 n.10 (3d Cir. 2012) (collecting cases). And where the plaintiff "has failed to demonstrate . . . a concrete injury sufficient to satisfy Article III standing," the case "must be dismissed on

9

jurisdictional grounds." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 347 (4th Cir. 2017). Indeed, the Third Circuit has dismissed a similar breach of contract claim for lack of standing in circumstances similar to those presented here. In *Lewis v. Government Employees Insurance Co.*, the plaintiffs alleged that their insurer had breached their contracts by making improper downward adjustments when valuing their vehicles. 98 F.4th 452, 457 (3d Cir. 2024). The evidence showed, however, that the plaintiffs had "ultimately avoided any financial injury." *Id.* at 460. The court concluded that the plaintiffs' theory "would impermissibly divorce their standing to sue from any real-world financial injury." *Id.*; *see also Dinerstein v. Google, LLC*, 73 F.4th 502, 519 (7th Cir. 2023) (recognizing that a plaintiff "cannot simply allege a bare breach of contract, 'divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III'" (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016))).

Because Freeman has failed to show that Progressive's use of Projected Sold Adjustments caused her any injury, she lacks standing. And without standing, Freeman's claim cannot be typical of the class members' claims. *See* Fed. R. Civ. P. 23(a)(3). The class therefore should not have been certified.

IV

Progressive also contends that there is no common issue of law or fact that predominates to satisfy the respective requirements of Rules 23(a)(2) and 23(b)(3). It claims, "Not only did Plaintiff fail to establish that common issues predominate over individualized ones (which is reason enough to reverse) — she failed to establish that there

10

are *any* common issues." It explains that even if Projected Sold Adjustments may have "*sometimes* underpredicted the sale price of specific used cars," Freeman has not and cannot show "that they *always* did so." Thus, she cannot show that Projected Sold Adjustments are "*categorically* wrong" in predicting vehicle prices. But more fundamentally, Progressive maintains that "the key elements of liability for [Freeman's] claim all unavoidably depend on the individualized question of whether Progressive paid each class member less than their vehicle's actual cash value."

We agree with Progressive that common questions of law or fact do not predominate in this case.

Freeman's claim is for breach of contract, and any predominance analysis must therefore begin with the elements of that claim to see whether class members "will prevail or fail in unison." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013); *see also EQT Prod.*, 764 F.3d at 366. Under South Carolina law, as elsewhere, to prove a breach of contract, the plaintiff must show the existence of a binding contract; a failure to perform the contract, *i.e.*, a breach; and damages as a result of the breach. *See Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962); *Advanced Pain Therapies, LLC v. Hartford Fin. Servs. Grp., Inc.*, No. 14-CV-00050, 2014 WL 4402800, at *2 (D.S.C. Sept. 3, 2014).

The existence of a binding contract here is not disputed. Progressive was obligated to pay Freeman the "actual cash value" — *i.e.*, the "market value" — for the loss of a covered vehicle that was totaled. The breach that Freeman alleges is that Progressive paid her and each class member *less than the actual cash value* that it was obligated to pay. The

11

policies involved included no contractual obligation to use or not to use any method of determining actual cash value — including Projected Sold Adjustments. It therefore follows that if Progressive paid the actual cash value, regardless of how it computed it, there could be no breach. Accordingly, for Freeman to succeed on her breach of contract claim, she had to show that the payment Progressive actually made to her was *less than the actual cash value* of her vehicle. And likewise, she would have to present evidence that members of the class received less than the actual cash value of their vehicles, regardless of whether the Projected Sold Adjustment was used in determining that value.

Yet the class in this case was defined to include anyone in South Carolina who was paid "compensation for the total loss of a covered vehicle, where . . . the actual cash value was decreased based upon Projected Sold Adjustments," regardless of whether the amount paid was indeed the true market value of the vehicle. Thus, the class was defined to include insureds who accepted Progressive's offer of payment; insureds who negotiated a higher payment; and insureds who invoked the appraisal process in the policy, simply because in each circumstance Progressive made its calculation using the Projected Sold Adjustment. Yet, none of those could claim injury because each agreed to resolution of the loss. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 427, 431 (2021) (holding that "*[e]very class member* must have Article III standing" — *i.e.*, must "have been *concretely harmed*" — "in order to recover individual damages" (first emphasis added)). This characteristic of the certified class alone justifies reversal of the class certification order.

But even more telling, the claims of class members who did not so voluntarily resolve their losses by acceptance of Progressive's offer, negotiation, or the appraisal

12

process would depend on a showing that the market value of the members' vehicles was greater than what Progressive paid. And that value would depend on the unique characteristics of each vehicle, such as the particular model of the vehicle and its trim level and options, the vehicle's postpurchase alterations, the mileage, the accident history, and the vehicle's condition. It would also depend on the public demand for that type and condition of vehicle in the immediate market where the insured lived. A vehicle in Charleston, South Carolina, for example, might have a different value than the same model in Greenville, South Carolina. This highly individualized assessment of the actual cash value of a vehicle would be essential to determining whether Progressive's payment amounted to the actual cash value and therefore to whether it breached the insurance contract. In short, the core proof of each breach of contract claim would have to center on the value of each individual vehicle involved. And the class members' claims for breach of contract are therefore not capable of classwide resolution, as they cannot be resolved "in one stroke." *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 679 (4th Cir. 2024) (quoting *Wal-Mart*, 564 U.S. at 350). In other words, the questions presented by this case will not "generate 'common answers that drive the litigation.'" *Id.* (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 909 (4th Cir. 2015)).

That precludes finding commonality and necessarily predominance. *See Lienhart*, 255 F.3d at 146 n.4 ("In a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions" (quoting *Amchem,* 521 U.S. at 609)). Indeed, "[c]ommonality requires the

13

plaintiff to demonstrate that the class members have suffered *the same injury*." *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 202 (4th Cir. 2024) (emphasis added) (quoting *Wal-Mart*, 564 U.S. at 349–50). But no such demonstration can be made here.

To be sure, the use of the Projected Sold Adjustment helped Progressive calculate its offer, but its mere use of that adjustment did not dictate whether it breached its contractual duty to pay actual cash value. A breach could only be determined by matching what Progressive actually offered and paid with the evidence of the actual cash value based on the unique characteristics of each vehicle and the market in which it was valued. Thus, Progressive's use of the Projected Sold Adjustment is essentially irrelevant to any alleged breach, and the legitimacy of its practice is certainly not an issue that predominates in resolving whether a breach of contract occurred. "[T]he district court placed an inordinate emphasis on . . . uniform practices without considering whether those practices [were] relevant to assessing the defendant['s] ultimate liability." *EQT Prod.*, 764 F.3d at 366.

Our conclusion in this case is in line with a large array of similar cases decided by courts of appeals across the country. *See Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 420–22 (5th Cir. 2023) (rejecting class certification because, among other things, it was possible that the defendant could satisfy its contractual obligation to pay actual cash value using a variety of valuation methodologies); *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 376 (8th Cir. 2018) (recognizing that, when "contracts did not specify how [actual cash value] payments would be calculated, whether [the insurer] was in breach would depend on whether its methodology produced a reasonable estimate of [actual cash value] . . . in an individual case" — a question that "could not be answered on a class

14

basis"); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 888–90 (7th Cir. 2011).

In *Kartman*, for example, the Seventh Circuit affirmed the district court's denial of class

certification under Rule 23(b)(3) of a purported class of policyholders who had alleged that

State Farm had undercompensated them based on how it evaluated their property-damage

claims. 634 F.3d at 887–88. The Seventh Circuit reasoned that the district court was

correct to deny "certification based on the particularized facts of each" of the plaintiffs'

claims and that, even if the plaintiffs had "evidence tending to show that some

policyholders received inadequate compensation for their losses," State Farm's method of

evaluating property damage did "not by itself establish liability for breach." *Id.* at 889–90.

In a case even more similar to this one, the Ninth Circuit evaluated a claim brought

against an insurer who "only owed each putative class member the actual cash value of his

or her car," such that "if a putative class member was given that amount or more, then he

or she [could not] win on the merits" of his or her breach of contract claim. *Lara v. First

Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022). The court noted that "figuring

out whether each individual putative class member was harmed would involve an inquiry

specific to that person," including "looking into the actual pre-accident value of the car and

then comparing that with what each person was offered, to see if the offer was less than the

actual value." *Id.* Such an analysis "would be an involved inquiry for each person," and

the Ninth Circuit accordingly concluded that "common questions do not predominate." *Id.*

And most recently, analyzing essentially the same claims made by the same counsel

as those in this case, the Third Circuit and Seventh Circuit held that common questions did

not predominate. *See Drummond v. Progressive Specialty Ins. Co.*, 142 F.4th 149 (3d Cir.

15

2025); *Schroeder v. Progressive Paloverde Ins. Co.*, __ F.4th __, No. 24-1559, 2025 WL 2083855 (7th Cir. July 24, 2025). Specifically, the Third Circuit explained, "The District Court would need to evaluate plaintiff-by-plaintiff proof to ascertain which plaintiffs Progressive actually underpaid and, accordingly, to which plaintiffs Progressive is liable for breach of contract." 142 F.4th at 156. The court noted that there were multiple "approaches [that] would allow Progressive to meet its contractual obligation to pay actual cash value," and that it "could have properly compensated class members *while* employing the Projected Sold Adjustments." *Id.* at 158 (cleaned up). The court concluded "that identifying whether each class member was actually paid less than true actual cash value is an individual question" requiring "individualized evidence of whether each class member's vehicle's actual cash value was greater than the final settlement value." *Id.* at 159 (cleaned up). The court therefore rejected the class that the district court had certified, holding that "common issues as to Progressive's liability do not predominate." *Id.* Following *Drummond*, the Seventh Circuit likewise recognized that "a jury would need to consider a host of individual questions to resolve whether Progressive failed to pay each putative class member" the actual cash value of their vehicle and that "[t]hose individual questions overwhelm any common ones." *Schroeder*, 2025 WL 2083855, at *1.

So too here. This is, at bottom, a straightforward breach of contract case where Freeman contends that Progressive failed to pay her the actual cash value of her totaled vehicle. And the district court recognized this to be the nature of the case, noting, "Plaintiff alleges that Defendant breached her insurance policy by paying less than the actual cash value ('ACV') of her totaled 2020 Chevrolet Equinox." To prove the breach, Freeman *and*

16

*every purported class member* would have to show that the market value of his or her vehicle — with all its unique characteristics — was greater than the amount Progressive paid.  This totally individualized process precludes class certification.  *See Schroeder*, 2025 WL 2083855, at *6–8; *Drummond*, 142 F.4th at 160–61; *Lara*, 25 F.4th at 1139.

Because Freeman's claim and the claims of all the purported class members are essentially individualized claims requiring mini trials as to each, we conclude that common questions do not predominate and that therefore the district court abused its discretion in certifying the class.

* * *

For the several reasons given, we reverse the district court's certification order of May 8, 2024.

REVERSED

17

BERNER, Circuit Judge:

The majority's decision reversing class certification rests on an erroneous view of Lynn Freeman's injury and the class's claims. The majority also steps well beyond its jurisdiction. Respectfully, I dissent.

## I.      Freeman's Standing

I begin with the majority's standing inquiry. The majority claims that Freeman lacks standing to sue Progressive because she cannot "demonstrate personal harm." Maj. Op. at 9. To the contrary, Freeman demonstrates a classic pocketbook injury, the likes of which this court has affirmed on many occasions.

Freeman's total loss vehicle was a 2020 Chevrolet Equinox with 23,122 miles. Progressive's software identified three comparable 2020 Chevrolet Equinoxes: one listed for $20,865 with 15,084 miles; another listed for $21,490 with 18,261 miles; and a third listed for $23,887 with 11,899 miles. The Projected Sold Adjustment at issue here and other adjustments were applied to these list prices, and then the adjusted prices were averaged to generate a base value for Freeman's vehicle of $20,531.63. Because Progressive's in-person inspection determined that neither the condition of Freeman's car nor any aftermarket parts warranted further adjustments, Progressive estimated that the actual cash value was $20,531.63.

At the time of the total loss, Freeman still owed $29,999.07 on her vehicle. Fortunately for her, she had the foresight to purchase loan payoff coverage and gap insurance. [J.A. 196–98, J.A. 204–05.] The loan payoff coverage was part of her insurance with Progressive. It required Progressive to pay an additional 25% of the actual cash value

18

if there was an outstanding loan. [J.A. 204.] That amounted to Progressive paying off $24,531.63 of Freeman's outstanding loan, less a $2,000 deductible. That left Freeman with $5,467.44 to pay off.

That's where her gap coverage came into play. Freeman had acquired gap coverage through a different insurance company, Warranty Solutions. The sole purpose of the gap coverage was to pay the difference between what Progressive paid out and any outstanding amount on her loan. Freeman applied for gap coverage, and Warranty Solutions paid the difference. That's where Freeman was left when she sued Progressive for paying too little on her coverage.

Freeman put forth expert testimony in support of her claim that Progressive was required to pay more after her vehicle was totaled. Freeman's experts opined that Progressive underestimated the actual cash value of Freeman's vehicle by applying the Projected Sold Adjustment. Had Progressive not applied the Projected Sold Adjustment, it would have paid more to cover Freeman's loss. Simply put, *that* is the injury. If Freeman is correct that applying the Projected Sold Adjustment violates the insurance contract, then Progressive owes her more than it paid. What could be a more classic pocketbook injury than that?

The majority suggests that because Freeman would be required to pass her recovery in this case along to her gap insurer, she has suffered no injury. Maj. Op. at 9–10. Not so. This court has rejected similar arguments in the past. The fact that Freeman would have to pass along any money she might recover in this suit, "cannot erase the fact that

19

[Progressive] owed it to her." *Netro v. Greater Baltimore Med. Ctr., Inc.*, 891 F.3d 522, 526 (4th Cir. 2018). This court has explained this rule by simple analogy:

> If Plaintiff Pam borrows something from Lender Lisa, and Defendant Dan steals it, Pam obviously has standing to recover from Dan. Her injury is not erased by the fact that the recovery will ultimately end up in Lisa's hands.

*Id.* at 526.

Freeman's injury is not erased by her obligation to pass her recovery to Warranty Solutions. If Progressive is found to owe money to Freeman, then she has suffered a pocketbook injury because Progressive breached the contract.

The majority also implies that Freeman lacks standing to sue because she "agreed to resolution of the loss." Maj. Op. at 12. Apparently, the majority believes that Freeman suffered no injury because she did not refuse Progressive's valuation and seek an appraisal. This is plainly incorrect. This court has never required insureds to take *optional* recourse with their insurers prior to bringing suit for breach of contract. Nor have we held that, because an insurer pays allegedly inadequate funds, the insured cannot sue for more if she is so entitled. Progressive's insurance contract explicitly provides that an insured is not required to seek an appraisal after receiving a valuation. To the contrary. The appraisal provision states repeatedly that appraisal is *optional*, both for the insured and for Progressive.* On the other hand, the contract does require Progressive to calculate the

---

* Notably, the appraisal provision also requires the insured to pay for her own appraiser and to split cost of arbitration with Progressive, conditions that would dissuade an insured from taking advantage of the optional appraisal provision.

20

actual cash value accurately and to pay that value to the insured in full. If Progressive fails to do so, as Freeman claims here, then the insured can sue for breach of contract.

Progressive *itself* expressly disavowed the majority's theory that Freeman and the class failed to exercise any contractual requirements. In direct response to the majority's standing theory, Progressive stated: "I have to be candid with the court, the appraisal provision is not mandatory, and so it is the case, I think, that if Progressive was proved to have not paid actual cash value, then Progressive might have been in breach of the contract." Oral Argument Recording at 6:27–39. The majority's unique theory of standing is out of step with the text of the contract and this court's precedent.

Finally, the majority includes a brief standing analysis for the proposed class in its discussion of predominance. Maj. Op. at 12. That analysis fails for the same reasons discussed above, as Freeman's claim is the same as the rest of the class. The majority gets that wrong too. It claims that the class includes "insureds who accepted Progressive's offer of payment; *insureds who negotiated a higher payment; and insureds who invoked the appraisal process in the policy*, simply because in each circumstance Progressive made its calculation using the Projected Sold Adjustment." Maj. Op. at 12 (emphasis added). Not so. The class definition includes only those who "received compensation for the total loss of a covered vehicle, *where that compensation was based on an Instant Report prepared by Mitchell* (i.e. Report Code= "COMP") and the actual cash value was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine actual cash value." J.A. 1405-06. The "Instant Report prepared by Mitchell" is the valuation that Progressive first prepares and offers to the insured. As the district court correctly observed,

21

the class definition is limited to insureds who, like Freeman, accepted the coverage that Progressive set out in its initial valuation without negotiating or seeking an appraisal.

## II.    Class Certification

Before addressing the class action certification issue, I reemphasize that the majority concludes that Freeman lacks standing to sue Progressive over the alleged breach of contract. Whether Freeman possessed standing is jurisdictional. As the majority itself seemingly recognizes, where the named plaintiff in a putative class action fails "to demonstrate s[he] has suffered a concrete injury sufficient to satisfy Article III standing," the "class action must be dismissed on jurisdictional grounds." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 347 (4th Cir. 2017). Rather than ending its analysis after determining that Freeman lacked standing, the majority nonetheless goes on to address the class certification issues. Respectfully, it should not have.

Federal courts possess limited jurisdiction. *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025). Where we find that the plaintiff in the underlying suit lacks standing, we may not address the merits of the district court's class certification decision. *Id.* "After all, '[w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Dreher*, 856 F.3d at 347 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). The majority's opinion on the class certification issue is thus advisory. *See Steel Co.*, 523 U.S. at 101. Yet, it is not this court's role to lend advice. *Id.* We address cases and

22

controversies as they properly come before us. *Id.* at 102. Because the majority claims there is no controversy, it should have stopped there. *Id.* at 101–02.

Because I would have found that Freeman possessed standing, and I disagree with the majority's assessment of the class certification, I will briefly address the class certification issues that the majority raises. Still, that portion of the majority opinion is dicta and beyond the majority's purview.

Class certification decisions are reviewed for abuse of discretion. *See, e.g.*, *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006). The district court in this case conducted extensive proceedings and made specific findings about common proof and predominance. We lend the district court deference for good reason—it is the district court that is tasked with overseeing the trial of class actions, not this court.

I note two points in which I agree with the majority. Indeed, "[t]his is, at bottom, a straightforward breach of contract case where Freeman contends that Progressive failed to pay her the actual cash value of her totaled vehicle." Maj. Op. at 16. I also agree that "for Freeman to succeed on her breach of contract claim, she had to show that the payment Progressive actually made to her was less than the actual cash value of her vehicle." Maj. Op. at 12. This "straightforward breach of contract case" comes down to one critical issue—did Progressive breach its contract with Freeman, and every other class member, by the applying Projected Sold Adjustment? Contrary to the majority's conclusion, this

23

question is one in which the class members "will prevail or fail in unison." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013).

In the majority's view, the class fails because calculating the actual cash value of a vehicle requires looking at several factors "such as the particular model of the vehicle and its trim level and options, the vehicle's postpurchase alterations, the mileage, the accident history, [] the vehicle's condition," and public demand specific to the local market. Maj. Op. at 13. The majority believes that the district court would have been required to examine each factor independently for each individual in order to determine whether the actual cash value was properly calculated. I disagree.

Perhaps unsurprisingly, Progressive's model for calculating the actual cash value of a totaled vehicle takes into account *all* the factors that the majority listed. Freeman *agrees* that all of the adjustments the majority is concerned about are appropriate. Freeman's experts opine that Progressive's methodology for calculating actual cash value accurately makes those adjustments. In fact, Freeman's experts agree that Progressive gets the actual cash value correct when it calculates, with the exception of a single adjustment—the Projected Sold Adjustment. Freeman's experts claim that, when Progressive applies the Projected Sold Adjustment deduction, it always necessarily underestimates the actual cash value of a vehicle.

That is precisely why this case is well-suited for class certification. Freeman's expert testimony supports her claim that Progressive accurately calculates the actual cash value but for the Projected Sold Adjustment. The only question left is the same for every class member—is the Projected Sold Adjustment a proper deduction? Because if it is not,

24

it categorically causes Progressive to pay less than actual cash value. If it is, then Progressive is paying the actual cash value. That is precisely the type of sweeping resolution well-suited for class certification. *See EQT Prod. Co. v. Adair*, 764 F.3d 347, 366 (4th Cir. 2014).

The Ninth Circuit—the first circuit to consider class certification for challenges to similar actual cash value vehicle adjustments—endorsed this view. In *Jama v. State Farm Mutual Automobile Insurance Co.*, the Ninth Circuit explained when certification is appropriate for a challenge to an automobile actual cash value adjustment. 113 F.4th 924 (9th Cir. 2024). In *Jama*, the challenged adjustments included a "condition" adjustment, and a "negotiation" adjustment. *Id.* at 927. *Jama* rejected the condition adjustment class because the Ninth Circuit had recently disapproved class certification for the same type of adjustment in *Lara v. First National Insurance Company of America*, 25 F.4th 1134 (9th Cir. 2022). The majority cites *Lara*, although it fails to note why the condition adjustment at issue in *Lara* differs from the Projected Sold Adjustment here. Maj. Op. at 15.

The condition adjustment in *Lara* assumed that the typical car in use is in worse condition than, and would sell for less than, comparable cars advertised by dealers and reduced the advertised price by that difference. 25 F.4th at 1136–37. While the disputed condition adjustment was initially a downward adjustment to the insurer's value estimate, that adjustment merely provided a starting place. *Id.* The insurer "also look[ed] at the actual pre-accident condition of the totaled car," such that "[i]f [the car] was in great condition, then [the insurer] reverse[d] the negative adjustment and sometimes even applie[d] a positive adjustment." *Id.* at 1137. A class member in *Lara* might have been subject to the

25

challenged condition deduction but been uninjured by it because a greater or equal condition addition could *also* have been lawfully applied. *Id.* at 1139. This would lead a class member to receive the actual cash value of their vehicle or more. *Id.*

Jama followed *Lara* and dismissed the condition adjustment class. *Jama*, 113 F.4th at 927. The Ninth Circuit recognized in *Jama*, however, that the negotiation adjustment operated differently. The negotiation adjustment assumed the typical customer negotiates with the dealer and buys a car for less than the advertised price. *Id.* at 927. The negotiation adjustment was designed to capture that price difference through a deduction to the actual cash value, much like the Projected Sold Adjustment here. *Id*. In short, while the condition adjustment could "have accurately reflected the condition of the car for some class members in *Lara*, there is no negotiation adjustment that could accurately price the negotiation discount here if [the plaintiffs were] correct that the adjustment is *always* unlawful, regardless of the amount." *Id.* at 934 (emphasis in original). The Ninth Circuit clarified that what "the negotiation class actually asked the factfinder to credit was the *whole* [insurer valuation] report, minus one specific uniformly applied downward adjustment." *Id.* The Ninth Circuit concluded that such a uniform downward adjustment, where the rest of the valuation was considered accurate, was amenable to class certification. *See id.*

The takeaway from *Jama* and *Lara* is that class certification is appropriate when the challenged adjustment categorically results in all class members receiving less than the

26

actual cash value. This rule makes inherent sense. An insurer can only be liable for breach of contract if it pays less than actual cash value.

Here, Freeman's theory is that application of the Projected Sold Adjustment *necessarily* results in a class member receiving less than the actual cash value, and her expert evidence supports such a theory. Freeman agrees that Progressive accurately predicts actual cash value, except when the Projected Sold Adjustment is applied. When the Projected Sold Adjustment is applied, it always depresses the payout below the actual cash value. That common question unites the class. Thus, the district court did not abuse its discretion in certifying the class and I would affirm its judgment.

27